**MARINE TRANSPORT LINES, INC., Plaintiff,**

v.

**INTERNATIONAL ORGANIZATION OF MASTERS, MATES, & PILOTS, Defendant.**

**No. 85 Civ. 1360 (EW).**

United States District Court, S.D. New York.

June 6, 1986.

---

Morgan, Lewis & Bockius, Washington, D.C., for plaintiff; Thomas K. Wotring, Eric A. Sisco, D. Michael Underhill, John F. Lauro, of counsel.

Bredhoff & Kaiser, Washington, D.C., Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for defendant; Michael H. Gottesman, Julia Penny Clarke, Mark D. Schneider, Natalie Wexler, Burton Epstein, Seymour Waldman, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Marine Transport Lines ("MTL"), brought this action seeking a declaration that its collective bargaining agreement with defendant International Organization of Masters, Mates & Pilots ("the Union") terminated at midnight on June 15, 1984. The defendant has asserted four counterclaims. The first counterclaim

alleges that the agreement did not terminate as claimed by the plaintiff, and that the plaintiff breached the agreement; the second alleges that a subsequent oral agreement between the parties extended the termination date of the agreement as to certain of MTL's vessels; the third alleges that the Union may recover for breach of the collective bargaining agreement under a theory of promissory estoppel; and the fourth claims tortious interference with contract. By opinion dated May 22, 1985, the Court held that so much of the Union's fourth counterclaim as concerned events occurring before the date of alleged termination of the contract, June 15, 1984, was subject to arbitration under the agreement's terms. In addition, the Court stayed consideration of the remainder of the fourth counterclaim pending resolution of the question of the collective bargaining agreement's termination.[1] Plaintiff now moves for summary judgment in its favor on its declaratory judgment claim, and against defendant on each of the counterclaims.

The master collective bargaining agreement (the "Master Agreement") about which this litigation centers was negotiated by the defendant Union and 109 operators of U.S.–flag oceangoing vessels, and established the terms and conditions of employment of defendant's members, who as licensed deck officers are considered supervisory personnel under the National Labor Relations Act.[2] The contract period and renewal procedure were set forth in the following provision:

The Organization and the Company hereby enter into an Agreement effective June 16, 1981 covering conditions of employment, wages, hours and working conditions said Agreement to be binding upon the parties and continue in full force and effect until midnight June 15,

1984, and shall be automatically renewed thereafter from year to year unless at least sixty (60) days before the expiration date designated herein or the expiration date of any renewal period, written notice of a desire to renegotiate, modify, amend or terminate the Agreement is given by certified mail by either party to the other.[3]

During the effective period of the Master Agreement, in the fall of 1982, MTL requested wage and benefit concessions by Union members working aboard nine vessels operated by MTL under contract with the United States Navy's Marine Sealift Command. MTL told the Union that the Navy would not renew its contract with MTL unless the Union agreed to the requested labor cost reductions. MTL's negotiators further informed the Union that MTL believed the loss of the Navy Sealift contract would force MTL into bankruptcy.

As a result of these discussions between MTL and the Union, the parties entered into an oral agreement (the "Sealift Agreement") covering those Union members working aboard the nine Sealift vessels. Wages under this agreement were rolled back to 1981 levels, and frozen for the two-year period from May 1983 to May 1985 covered by the proposed extension of the contract between the Navy and MTL; vacation and other benefits were also decreased. The modifications to the terms of employment aboard the nine Sealift vessels were never reduced to writing; MTL submitted a draft agreement to the Union in June 1983, but the Union refused to sign. While the Union acknowledges that five of the draft agreement's paragraphs set forth the terms of the oral agreement, the Union contends that the one new term was includ-

---

1. *Marine Transport Lines v. International Org. of Masters, Mates & Pilots,* 609 F.Supp. 282 (S.D.N.Y.1985).

2. 29 U.S.C. § 152(11); *See International Org. of Masters, Mates & Pilots,* 575 F.2d 896, 904 (D.C. Cir.1978).

3. Master Collective Bargaining Agreement, Affidavit of Captain Robert Lowen, Ex. A, at 2.

ed in the draft written agreement which was not acceptable.[4]

On April 8, 1984, more than sixty days in advance of the June 15 expiration date of the Master Agreement, the Union sent to all employer parties to the Master Agreement a letter which stated, in its entirety:

> This letter shall constitute written notification of our intention to *modify* and *amend* our present Collective Bargaining Agreement which expires at midnight, June 15, 1984. We are prepared to meet at a mutually convenient date.[5]

On April 12, 1984, counsel for the multi-employer bargaining committee which represented MTL replied to the Union that the employers "also wish[ed] to engage in negotiations with respect to modifying and amending the instant Contract." [6] On June 6, 1984, MTL withdrew from the multi-employer bargaining committee.[7] No further negotiations between MTL and the Union were held; on June 15, 1984, MTL sent to each Union deck officer in its employ a letter stating that MTL would no longer recognize MM & P as the bargaining agent for its deck officers, and setting forth unilateral terms and conditions of continued employment.

### Plaintiff's Claim and Defendant's First Counterclaim

MTL contends that the Union's April 8 letter constituted sufficient notice under the applicable clause of the Master Agreement to prevent automatic renewal of that agreement on June 16, 1984. The Union argues that the letter was not notice to terminate the agreement, but was merely notice of intent to modify or amend it. It emphasizes that its notice did not use the word "terminate," and contends that the agreement was therefore automatically re-

newed. This controversy as to the interpretation of the April 8 letter is at the heart of the issues presently before the Court. MTL relies upon the April 8 letter to support its motion for declaratory relief holding that the Master Agreement expired on June 16, 1984; the Union, on the basis of its contrary interpretation, asserts its first counterclaim for breach of the Master Agreement.

■ It is of course a settled principle that the interpretation of collective bargaining agreements is a matter of federal substantive law, and not of state statutory or common law.[8] The present motions seek summary judgment, and as our Court of Appeals has repeatedly made clear, summary judgment is not appropriate if the contract language at issue is ambiguous, or is subject to more than one interpretation.[9] On its face, the duration clause of the Master Agreement is entirely unambiguous. It states that the Agreement is to "continue in full force and effect until midnight June 15, 1984, and shall be automatically renewed thereafter from year to year unless at least sixty (60) days before the expiration date ... written notice of a desire to renegotiate, modify, amend or terminate the Agreement is given by ... either party to the other." Automatic renewal occurs unless any of the enumerated types of notice is given; no functional or grammatical distinction is drawn between notice to terminate on the one hand and notice to renegotiate, amend, or modify on the other.

The conclusion that the language of the Master Agreement is unambiguous on its face is supported by the decisions of other courts which have reached the same result with respect to similar contract language,[10]

---

4. *See* Affidavit of Robert Lowen, ¶¶ 12–27.

5. *Id.,* Ex. B (emphasis supplied).

6. *Id.,* Ex. C.

7. *Id.,* Ex. D.

8. *Teamsters Local 174 v. Lucas Flour Co.,* 369 U.S. 95, 105, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962).

9. *Bank of America Nat'l Trust v. Gillaizeau,* 766 F.2d 709, 715 (2d Cir.1985); *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4 (2d Cir.1983); *Heyman v. Commerce & Industry Co.,* 524 F.2d 1317, 1320 (2d Cir.1975).

10. *See, e.g., Irwin v. Carpenters Health & Welfare Trust Fund,* 745 F.2d 553, 555–56 (9th Cir. 1984) (notification provision of duration clause held unambiguous); *Kaufman & Broad Home Systems, Inc. v. International Bhd. of Firemen,* 607 F.2d 1104, 1109 (5th Cir.1979) (duration

and indeed with respect to the very provision here at issue.[11] Both the federal courts and the National Labor Relations Board have frequently held that where a collective bargaining agreement does not explicitly differentiate between the functional effect of notice to modify and notice to terminate, notice of a party's intention to modify is sufficient to prevent automatic renewal of the agreement.[12]

In opposition to MTL's motion for summary judgment, the Union contends that the duration clause of the Master Agreement provides for two distinct forms of notice—notice to terminate and notice to modify or amend—which have different practical effects. In particular, the Union's president states that he was the draftsman of the clause at issue and that his understanding of the clause was that notice to modify or amend was distinct and entirely separate from notice to terminate, because the subject of the negotiations held in the sixty days following notification would vary substantially with the type of notice

given.[13] While it may well be true that the subject of negotiation occurring after notice to terminate would differ from the negotiations following a notice of desire to amend, it does not follow that the two types of notice must have differing results with respect to the automatic renewal provision. Any form of notice, under the plain meaning of the words, prevents automatic renewal.

■ The Union argues that to permit automatic expiration in this case is inequitable, because the Union here represents supervisory personnel, who are not covered by the National Labor Relations Act's guarantee of the right to collective bargaining.[14] Since employers are not statutorily required to recognize or bargain with supervisor unions, the expiration of a supervisors' collective bargaining agreement frees the employer to refuse recognition to the supervisors' representative, as occurred in the present case. On the basis of these

clause held unambiguous; notice of intent to modify held functionally equivalent to notice of termination); *Oil, Chem. & Atomic Workers' Int'l Union v. American Maize Prods.*, 492 F.2d 409, 411 (7th Cir.) (notice to modify which did not specify modifications sought held equivalent to notice to terminate), *cert. denied*, 417 U.S. 969, 94 S.Ct. 3173, 41 L.Ed.2d 1140 (1974).

11. *International Org. of Masters, Mates & Pilots v. Victory Carriers, Inc.*, 84 Civ. 7073, slip op. at 6 (S.D.N.Y. Apr. 9, 1985); *International Org. of Masters, Mates & Pilots v. Trinidad Corp.*, C84–812V, slip op. at 3 (W.D.Wash. Nov. 28, 1984). [Available on WESTLAW, DCTU database]. MTL contends that these prior holdings that the Union's April 8, 1984 letter prevented automatic renewal of the Master Agreement, though they occurred in the course of litigation between the Union and other employers who were party to the Master Agreement, collaterally estop the Union from asserting that the contract did not terminate on June 15, 1984. While collateral estoppel may be invoked to preclude defenses even where the party asserting the estoppel was not party to the prior proceedings, the application of such "offensive non-mutual" collateral estoppel rests in the broad discretion of the trial court. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979). In light of its conclusion on the merits, the Court in the exercise of its discretion finds it unnecessary to address plaintiff's claim of collateral estoppel.

12. *See Kaufman & Broad Home Systems, Inc. v. International Bhd. of Firemen*, 607 F.2d 1104, 1109 (5th Cir.1979); *Oil, Chem. & Atomic Workers' Int'l Union v. American Maize Prods.*, 492 F.2d 409, 411 (7th Cir.), *cert. denied*, 417 U.S. 969, 94 S.Ct. 3173, 41 L.Ed.2d 1140 (1974); *Baker v. Fleet Maintenance, Inc.*, 409 F.2d 551, 554 (7th Cir.1969); *NLRB v. Crowley's Milk Co.*, 208 F.2d 444, 446 (3rd Cir.1953); *Pullman, Inc. v. International Brotherhood of Boilermakers*, 354 F.Supp. 496, 498 (E.D.Pa.1972); *International Bhd. of Painters, Local 567*, 263 N.L.R.B. 1288 (1982); *South Texas Chapter, Assoc. Gen'l Contractors*, 190 N.L.R.B. 383, 385 (1971); *Deluxe Metal Furniture*, 121 N.L.R.B. 995 (1958). In its opposition to the motion for summary judgment, the Union relies upon *United Steel Workers of America v. Shakespeare Co.*, 84 F.Supp. 267 (W.D.Mich.1949), and *Sears, Roebuck & Co. v. International Assoc. of Machinists, Lodge 1327*, 46 L.R.R.M. 2324 (Cal.Super.Ct.1960). These cases involved contracts which, so far as can be determined from the reported decisions, distinguished between the functional effects of notice to modify and notice to terminate.

13. *See* Affidavit of Robert Lowen, ¶¶ 4–5.

14. 29 U.S.C. §§ 152(3), 152(11), 164(a); *see NLRB v. Yeshiva University*, 444 U.S. 672, 674, 100 S.Ct. 856, 858, 63 L.Ed.2d 115 (1980); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974).

differing consequences in the case of supervisor unions, the Union argues that "whatever may be the proper rules of construction for automatic-renewal clauses in labor agreements covering 'employees' within the meaning of the NLRA, different considerations affect ascertainment of the parties' intentions in adopting such a clause here." [15]

This argument is without substance. The duration clause of the Master Agreement is unambiguous; the subjective intention of the Union's President, who asserts that he drafted the clause is irrelevant to its interpretation. The Union now objects that the automatic renewal provision operates to its disadvantage as a supervisors' union; it drafted the clause, however, in full knowledge of the differing treatment of supervisors' unions under the NLRA. The Court's responsibility is to interpret the contract the parties actually entered into, not the one which, in hindsight, one party would have preferred. The statutory scheme created by the NLRA is one which places a premium on the results of privately-conducted collective bargaining. As one Court of Appeals has said in this context, "[j]udicial rewriting of labor contract terms that are clear in both the language used and situations addressed would undermine this private bargaining process which federal labor policy promotes." [16] Accordingly, MTL's motion for summary judgment declaring that the Master Agreement expired according to its terms on June 15, 1984, is granted. MTL's motion for summary judgment dismissing the Union's first counterclaim is necessarily granted as well.

*Breach of the Sealift Agreement*

In its second counterclaim, the Union alleges that the November 1982 oral Sealift Agreement, which covered the Union's members serving aboard the nine Sealift vessels operated by MTL under contract with the Navy, extended the term of the Master Agreement through the end of MTL's contract with the Navy in May 1985. Accordingly, the Union contends, even if the Master Agreement expired on June 15, 1984, it remained in effect on the nine Sealift vessels pursuant to the oral Sealift Agreement until May 1985. MTL disputes this interpretation, contending that the Sealift Agreement was a "free-standing" contract which did not incorporate the Master Agreement between MTL and the Union, and did not extend the term of the Master Agreement, with respect to the Sealift vessels, past June 15, 1984.

Though the Sealift Agreement was never reduced to writing, both MTL and the Union state that the draft agreement submitted to the Union by MTL in June 1983 summarized the terms of the earlier oral agreement. In view of the Union's acknowledgement that the first five paragraphs of the draft agreement reflect the oral agreement, and the Union's contention that the parties intended the Sealift Agreement to incorporate and extend the earlier Master Agreement, it is worthy of note that the written draft, which also contained one additional term which made it unacceptable from the Union's point of view but which is not material to the present examination, does not explicitly incorporate the Master Agreement, but does refer to certain of its clauses. Thus, for example, ¶ 4 of the draft agreement applicable to Sealift personnel provides that "[t]he vacation schedule under Section XXVIII [of the Master Agreement] shall be amended to cover all licensed Deck Officers accruing 13 days vacation for each 30 days employment." [17]

The draft written agreement does not resolve the fundamental dispute between the parties as to the Sealift Agreement's scope. Whether or not the oral Sealift Agreement was intended to extend the duration of the Master Agreement as applied to the nine Sealift vessels is in ·sharp factual dispute between the parties.

**15.** Memorandum in·Opposition, at 16.

**16.** *Irwin v. Carpenters Health & Welfare Trust Fund,* 745 F.2d 553, 557 (9th Cir.1984).

**17.** Affidavit of Robert Lowen, Ex. N.

It is axiomatic that on a motion for summary judgment the Court can only determine whether there are factual issues to be tried; it may not try them.[18] The interpretation of the Sealift Agreement must await a trial on the merits. Accordingly, MTL's motion for summary judgment dismissing the Union's second counterclaim is denied.

*Promissory Estoppel*

The Union's third counterclaim alleges that in the course of the negotiation of the Sealift Agreement in the fall of 1982, MTL's negotiators made oral and written promises of a continuing relationship between MTL and the Union. The Union contends that it relied to its detriment on these promises of continuing relationship in making the concessions which formed the basis of the Sealift Agreement, and that MTL was barred, under a theory of promissory estoppel, from discontinuing the Master Agreement in June 1984, more than eighteen months later.

In support of its allegation of promises of a continuing relationship, the Union's president states in his affidavit that during and after the negotiations leading to the Sealift Agreement, MTL's representatives repeatedly made the statement that MTL and the Union were "partners." In particular, Captain Lowen states that such an assurance was made to him by MTL's president.[19] Captain Lowen also cites a statement made by MTL's president in a letter to him dated January 7, 1983, after the oral Sealift Agreement became effective. In that letter, MTL's president stated that "[w]ith your favorable action, we now look forward to putting these hard times in the shipping industry behind us and growing together."[20] In addition, Captain Lowen relies upon a letter sent by MTL to the United States Navy's Military Sealift Command, dated November 16, 1982, which states that "[o]ur relationship with our unions is an extremely close one, based in large part on the recognition that our endeavor is a cooperative one. Both MTL and its unions recognize the need for cost efficiency and have agreed that the long term interest of our industry is best served if we both contribute toward our common objective."[21] Captain Lowen avers that these statements constituted representations and promises upon which the Union relied in making the concessions required as part of the Sealift Agreement:

> MTL used these representations to persuade me that by agreeing to those concessions the Union would be investing in its own future well-being and the well-being of its members, not merely in the financial status of MTL. These promises ... as expressed during the negotiations of the Sealift concessions and repeated afterward, were part of the inducement for the Union to agree to costly concessions ... The Union relied on these promises and representations in agreeing to make the concessions. Many of its members, as a result, relinquished compensation that they were contractually entitled to receive.[22]

MTL concedes for the purposes of its motion, as it must, that its representatives made the quoted statements, but denies that this gives rise to any liability on a theory of promissory estoppel.

It is an undecided question whether a claim for promissory estoppel lies within the scope of § 301 of the National Labor Relations Act;[23] the only Court of Appeals presented with the issue has explicitly left it open.[24] Resolution of this issue must be

---

**18.** *See R.G. Group v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984); *United States v. Matheson,* 532 F.2d 809, 813 (2d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976); *Empire Elec. Co. v. United States,* 311 F.2d 175, 179 (2d Cir.1962).

**19.** Affidavit of Robert Lowen, ¶¶ 20–21.

**20.** Affidavit of Robert Lowen, ¶ 34 & Ex. M at 3.

**21.** *Id.* at ¶ 34 & Ex. H at 1.

**22.** *Id.* at ¶¶ 34–35.

**23.** 29 U.S.C. § 185.

**24.** *Local 1330, United Steel Workers v. United States Steel,* 631 F.2d 1264, 1279 (6th Cir.1980); *see Amalgamated Local 813 v. Diebold Inc.,* 605 F.Supp. 32, 38 (N.D.Ohio 1984); *Abbington v.*

left for another day, for upon the undisputed factual record, defendant cannot establish the elements of a claim for promissory estoppel.

■ The most basic formulation of the doctrine of promissory estoppel is found in § 90 of the Second Restatement of Contracts, which states the rule that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." [25] Our Court of Appeals, drawing upon New York law, has stated that the elements of a claim for promissory estoppel are: (1) a clear and unambiguous promise; (2) a reasonable and forseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel.[26] The record upon which the Union resists the MTL's motion for summary judgment does not disclose the clear and unambiguous promise which is an indispensable element of a promissory estoppel claim. The essence of the Union's counterclaim is the allegation that the statements by MTL's president and other representatives during and after the negotiation of the Sealift Agreement committed MTL to the maintenance of a long-term relationship with the Union. The statements themselves, quoted above, are not a clear promise to this effect. In short, the Union's promissory estoppel claim depends upon the assertion that the statements "we're partners," and "we look forward to growing together," along with the statement *to a third party* that MTL and its unions have a "common objective," amounted to a promise to keep the collective bargaining agreement in force for the forseeable future. These statements, made in the course of discussions between experienced labor negotiators, could not

reasonably be interpreted as a promise to renew the Master Agreement eighteen months later.

In addition to the absence of a clear and unambiguous promise, defendant's claim must also fail because this is not a case in which, in the Restatement's words, "injustice can be avoided only by enforcement of the promise." The result sought by the Union would be particularly *unjust* in light of the Court's finding upon the undisputed factual record that the Master Agreement expired as a result of the Union's own action. Accordingly, plaintiff's motion for summary judgment dismissing the defendant's third counterclaim is granted.

*Defendant's Fourth Counterclaim*

■ The Union's fourth counterclaim alleges an interference with the relationship between the Union and its members, relying upon § II(1) of the Master Agreement, which states in pertinent part that:

The Company will not engage in activities or assist or encourage Licensed Officers, or others who are not members of the Organization, in activities calculated to undermine the status of the Organization as the sole collective bargaining representative. The Company will not attempt to influence or persuade any member of the Organization to withdraw therefrom nor will the Company, in any way, attempt to interfere with the internal affairs of the Organization.

The factual basis of this claim is MTL's conduct both before and after June 15, 1984, in preparing and disseminating unilateral terms and conditions of employment for its licensed deck officers, and in soliciting those officers to continue in MTL's employ after MTL refused to recognize the Union as the bargaining representative of its members. In its previous opinion, the Court held that any claims by the Union based on conduct before June 15, 1984,

*Dayton Malleable, Inc.,* 561 F.Supp. 1290, 1296 (S.D.Ohio 1983), *aff'd mem.,* 738 F.2d 438 (6th Cir.1984).

**25.** *Restatement (Second) of Contracts* § 90(1) (1981).

**26.** *R.G. Group v. Horn & Hardart Co.,* 751 F.2d 69, 78 (2d Cir.1984); *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 264 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

when the Master Agreement was concededly in force, are governed by the arbitration clause of that agreement, and could not be made the subject of an action here. The Court also held that:

> If, as alleged in the counterclaim, the Employer engaged in the proscribed conduct, it was a clear breach of the contract. The fact that such conduct may give rise to a separate tort under state law does not serve to evade preemption of the claim under federal law. Defendant's "tortious interference" allegations add nothing to its basic factual claim.
>
> In such circumstances, the Court finds that defendant's tortious interference claim is preempted by federal law.[27]

The Union's counterclaim alleges that by its actions after June 15, 1984,

> MTL has wrongfully repudiated and breached its contractual commitment not to undermine the status of the Union or to influence or persuade members of the Union to withdraw therefrom and has tortiously interfered with the contractual and economic relationships between the Union and its members. MTL's conduct constitutes a breach of that Agreement, in violation of § 301 ... and is also in violation of state law of contracts and torts.[28]

As is clear from the face of the pleading, the Union's fourth counterclaim alleges a breach of § II(1) of the Master Agreement, a claim which, as the Court previously ruled, is governed by federal law, and may not be the subject of a state-law contract or tort action. Because the Court has found above that the Master Agreement expired on June 15, 1984, no action for breach of the Agreement can be maintained for conduct occurring after that date. The National Labor Relations Act provides, as previously noted, that employers have no duty to recognize or bargain with supervisor unions, except to the extent that such duties are created by contract. MTL's duty to refrain from undermining the status of the Union and from seeking to persuade Union members to resign ended when the contract expired. Accordingly, plaintiff's motion for judgment on the pleadings dismissing the fourth counterclaim pursuant to Fed.R.Civ.P. 12(c) is granted.

So ordered.

---

**27.** *Marine Transport Lines, Inc. v. International Org. of Masters, Mates & Pilots,* 609 F.Supp. 282, 286–87 (S.D.N.Y.1985).

**28.** Amended Counterclaims ¶ 28.