**MARINE TRANSPORT LINES, INC., Appellant,**

v.

**INTERNATIONAL ORGANIZATION OF MASTERS, MATES & PILOTS, Appellee.**

No. 1072, Docket 89–7040.

United States Court of Appeals, Second Circuit.

Argued April 25, 1989.

Decided June 13, 1989.

Michael D. Blechman, Kaye, Scholer, Fierman, Hays & Handler, New York City (Eric A. Sisco, Morgan, Lewis & Bockius, Los Angeles, Cal., D. Michael Underhill, Francis X. Coonelly, Morgan, Lewis & Bockius, Washington, D.C., Peter N. Popov, Gen. Counsel, Marine Transport Lines, Inc., Secaucus, N.J., of counsel), for appellant.

Michael H. Gottesman, Bredhoff & Kaiser, Washington, D.C. (Robert M. Weinberg, Raymond C. Hurley, Bredhoff & Kaiser, Washington, D.C., Seymour Waldman, Vladek, Waldman, Elias & Engelhard, P.C., New York City, Burton Epstein, Intern. Organization of Masters, Mates & Pilots, Linthicum Heights, Md., of counsel), for appellee.

Before OAKES, Chief Judge, and MESKILL, Circuit Judge.[*]

OAKES, Chief Judge:

The parties in this contract dispute are Marine Transport Lines, Inc. (MTL), a shipowner, and the International Organization of Masters, Mates & Pilots (MM & P), which represents deck officers in the merchant marine. In 1981, MTL and MM & P signed a collective bargaining agreement covering the deck officers employed by MTL. The agreement, called the Master Agreement, ran for three years and was scheduled to expire on June 15, 1984. It would be renewed automatically from year to year unless either party gave notice at least sixty days before the expiration date of an intention to modify, amend, or terminate the agreement.

Halfway through the term of the Master Agreement, MTL sought concessions from MM & P in order to obtain the renewal of a contract under which MTL operated nine "Sealift" tankers for the United States Navy. In November 1982, MTL and MM & P agreed to modify certain terms of their Master Agreement as it applied to the Sealift tankers. In this so-called Sealift Agreement, the union accepted reductions in wages and other benefits from January 1, 1983 through May 6, 1985, which covered the term of the new contract that MTL hoped to conclude with the Navy.

The controversy between these parties arose in 1984. On April 8, MM & P informed MTL that the union intended to modify and amend the Master Agreement when it expired in June, 1984. Then, on June 15, MTL announced that the Master Agreement had expired and that the company no longer recognized MM & P as the representative of its deck officers. The following day, MTL sued for a declaratory judgment that, because of MM & P's April 8th communication, the Master Agreement had terminated on June 15, 1984. MM & P asserted four counterclaims. The late Judge Edward Weinfeld granted summary judgment to MTL on three of those counterclaims, including MM & P's assertion that the Master Agreement had been automatically renewed. He found, however, that there was a factual dispute between the parties concerning the scope of the Sealift Agreement. Hence, MM & P's counterclaim alleging that the Sealift Agreement had extended the term of the Master Agreement with respect to the nine tankers could not be resolved by summary judgment. *Marine Transp. Lines, Inc. v. International Org. of Masters, Mates & Pilots,* 636 F.Supp. 384 (S.D.N.Y.1986).

The case came to trial on MM & P's remaining counterclaim before Judge Kenneth Conboy, sitting without a jury. MTL's position was that the Sealift Agreement existed independently of the Master Agreement and did not change the expiration date of the Master Agreement. MM & P argued that, when the parties concluded the Sealift Agreement, they intended that it should extend the term of the Master Agreement with respect to the Sealift tankers. Judge Conboy ruled in favor of MM &

[*] Immediately after oral argument, Judge John Minor Wisdom of the United States Court of Appeals for the Fifth Circuit, who was sitting by designation, disqualified himself.

P, *Marine Transp. Lines, Inc. v. International Org. of Masters, Mates & Pilots*, 696 F.Supp. 1 (S.D.N.Y.1988), and MTL filed this appeal. We agree with the district court that the Sealift Agreement modified the terms of the Master Agreement and extended its term until May 7, 1985, with respect to the Sealift tankers. We therefore affirm Judge Conboy's decision.

## BACKGROUND

Judge Conboy presented a detailed narrative of the facts in this case. *See Marine Transp. Lines*, 696 F.Supp. at 1–14. We will summarize the events here and refer the curious reader to the district court opinion for additional details. We will also eschew an extensive analysis of the legal issues, for we agree with most of what Judge Conboy wrote. *See id.* at 14–28. In our discussion below, we will focus instead upon the issues that, in our opinion, merit further discussion.

The deck officers represented by MM & P are supervisory personnel under section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11) (1982). MTL is therefore not obliged to recognize or bargain with a representative of its captains and mates. *See* 29 U.S.C. § 164(a); *Marine Transp. Lines*, 636 F.Supp. at 386 & n. 2, 388. Nevertheless, MTL and MM & P have, since at least the 1960s, concluded a series of collective bargaining agreements. The 1981 Master Agreement was the last in this series.

Meanwhile, in 1974, MTL had concluded a five-year contract with the Navy to operate its nine Sealift tankers. The Navy reimbursed MTL for its labor costs, which MTL documented by submitting a "Schedule A." Schedule A enumerated "total wages," defined by the contract to include wages, pension and welfare payments, vacation benefits, etc. The contract included an escalation clause which committed the Navy to reimburse MTL for increased labor costs. Whenever MTL's labor costs changed, the company sent the Navy a revised Schedule A.

MTL secured two-year renewals of its Navy contract in 1979 and 1981. In the early 1980s, however, the American merchant marine was continuing to suffer hard times. Competition intensified. In 1982, MTL faced a crisis: It had failed in three recent attempts to win new contracts with the Navy. As the time for renewing the Sealift tanker contract approached, MTL feared that the Navy would open that contract to competitive bidding. The company calculated that it could not bid successfully for the contract (or persuade the Navy to renew the contract without soliciting additional bids) unless it drastically reduced its labor costs. Moreover, MTL's corporate survival depended upon continuing to operate the Sealift tankers. If MTL lost the Navy contract, it would probably fail to obtain loans that it needed to purchase a new ship, and it risked being liquidated by its parent company, GATX Corp.[1]

Hoping to reduce its labor costs, MTL turned to its unions and sought modifications in its collective bargaining agreements. MTL asked MM & P for four concessions that would apply only to deck officers working on the Sealift tankers: (1) the reduction of wages to their level of June 16, 1981, with wages frozen at that level for the duration of the upcoming extension of MTL's contract with the Navy (i.e., until May 7, 1985); (2) elimination of the "diesel and automation allowance"; (3) reductions in vacation entitlements; (4) job-related travel in economy class, rather than first class. There were discussions between Thomas Murphy, MTL's personnel manager, and Robert Lowen, MM & P's international president, in which Murphy asserted that the deck officers' jobs depended upon agreeing to the concessions. Finally, on November 15, 1982, officials of MTL and MM & P met and agreed orally upon the changes proposed by MTL. This was the parties' Sealift Agreement. It included one concession to MM & P: The union would have the right to shift costs, so long as the

---

1. For this appeal, MTL filed a statement disclosing interested parties pursuant to Rule § 0.15 of the Court of Appeals for the Second Circuit.

According to the statement, MTL is now a publicly traded corporation with no corporate parent.

total, reduced compensation remained unchanged.[2]

MTL negotiated with the Navy during this period and described the concessions that it sought from its unions. It submitted a revised Schedule A showing projected reductions in "total costs," and it estimated that the concessions would reduce annual operating costs by almost one million dollars per vessel. On November 12, 1982, MTL stated that it already had its unions' agreement to the lower wages; it submitted additional revised Schedule A's and assured the Navy that the figures would remain firm during the 1983–85 option period. Immediately after the November 15th meeting with the MM & P officials, MTL informed the Navy that the unions had agreed to implement the changes on January 1, 1983, rather than on May 7, 1983, when the next extension would begin. MTL reiterated that the new Schedule A would be "firm through May 1985."

MTL also weathered a storm with MM & P. It appeared that Lowen had not complied with his union's procedures for agreeing to modifications in contract terms under its "hardship rule." He intimated that MM & P might not be able to go through with the deal. This led to an animated meeting of MTL and MM & P officials during the Thanksgiving 1982 weekend. MTL's president, James Rand, agreed to provide the documentary support needed by Lowen to justify the concessions, and Lowen signed a letter for the Navy confirming the concessions that his union had made.

The unions' concessions satisfied the Navy. An internal government memorandum noted approvingly that, "under the revision of MTL's Scehdule [sic] A which is to become effective on 1 January 1983, total wages (including fringe benefits) will

actually decrease by approximately 30 percent in comparison with the currently effective Schedule A." On December 1, 1982, the Navy exercised its option to renew its Sealift contract with MTL for the period May 7, 1983 through May 6, 1985.

## DISCUSSION

Judge Weinfeld identified the disputed issue on which summary judgment could not be granted as being "[w]hether or not the oral Sealift Agreement was intended to extend the duration of the Master Agreement as applied to the nine Sealift vessels." *Marine Transp. Lines*, 636 F.Supp. at 389. After an eight-day bench trial, Judge Conboy found that the Sealift Agreement was "indisputably a modification" of the Master Agreement. *Marine Transp. Lines*, 696 F.Supp. at 15. He held that the existence of six modifying terms in the Sealift Agreement had been proven by clear and convincing evidence. These six modifications were: the four wage and benefit concessions sought by MTL, the duration of the Sealift Agreement until May 7, 1985, and the right of MM & P to make changes in the allocation of the benefits. *Id.* Judge Conboy concluded that "the parties intended that the Sealift Agreement extend the entire Master Agreement (as modified by the Sealift Agreement) with respect to the Sealift vessels until May 7, 1985." *Id.* at 21. He therefore dismissed MTL's complaint for declaratory judgment as it related to MM & P's surviving counterclaim and entered judgment in favor of MM & P. Other disputes between the parties were, pursuant to a stipulation, referred to arbitration.

 The intent of the parties to a contract is, there is little doubt, a question of fact. *See Lowell v. Twin Disc, Inc.*, 527

---

**2.** The parties never executed a writing to reflect their agreement. In June 1983, Murphy sent a draft "Memorandum of Agreement" to Lowen, explaining that the Navy required a formal agreement "respecting the contract changes pertaining to the Sealift Tankers." *Marine Transp. Lines*, 696 F.Supp. at 12 & n. 11. MTL and MM & P agree that the memorandum accurately embodied the Sealift Agreement. However,

Lowen did not sign the memorandum because it included an additional, objectionable paragraph that is irrelevant to the issues in this case. The memorandum also did not include the concession to MM & P giving it the right to shift costs. The parties agree that MM & P gained that right, but they disagree over its scope. *See id.* at 15–16.

F.2d 767, 769–70 (2d Cir.1975). In a bench trial, the court's findings concerning the intent of the contracting parties will accordingly not be disturbed unless they are clearly erroneous. *May v. Nevada Irrigation Dist.*, 600 F.2d 1280, 1282 (9th Cir. 1979); Fed.R.Civ.P. 52(a). This applies to all fact-finding; under Rule 52(a), there is no distinction between "subsidiary" and "ultimate" facts. *Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). These fundamental rules frame the issue for us in this appeal: Judge Conboy's conclusion that MM & P and MTL intended to extend the duration of the Master Agreement, as well as his findings concerning particular modifications of the Master Agreement, were findings of fact, and we must therefore affirm these findings unless they are clearly erroneous. *See Amerdyne Indus. v. Pom, Inc.*, 760 F.2d 875, 877 (8th Cir.1985).

MTL argues that an oral agreement to modify a contract must be proven with evidence that is "so definite and unequivocal as to leave no doubt as to the parties' intent." It cites, for example, *Amerdyne Industries*, 760 F.2d at 877, in which the Court of Appeals for the Eighth Circuit required "clear, unequivocal, and decisive evidence," and *Gloeckner v. School District of Baldwin*, 405 Pa. 197, 200, 175 A.2d 73, 75 (1961), in which the Supreme Court of Pennsylvania required evidence "of such specificity and directness as to leave no doubt." MTL argues further, of course, that MM & P's proof in this case fell short of this rigorous standard. The district court found, however, that MM & P had proven the modification of the Master Agreement by clear and convincing evidence; accordingly, it was unnecessary for the court to decide whether that high standard of proof was required. *Marine Transp. Lines*, 696 F.Supp. at 15.

■ We agree with Judge Conboy that the Sealift Agreement must be deemed a modification of the Master Agreement. The evidence shows without any doubt that the parties intended to "amend"—i.e., to modify—the Master Agreement when they negotiated and concluded the Sealift Agree-ment. *See id.* at 15 & n. 12 (reviewing evidence and noting that the parties used the term "amend" in lieu of "modify"). The Sealift Agreement thus was not a "side agreement" that existed independently of the Master Agreement or that superseded it.

■ The evidence also shows that this modification of the Master Agreement was not limited to the four wage and benefit concessions sought by MTL; it was the intent of the parties to extend the term of the entire Master Agreement as it applied to the nine tankers. The fact that there was no explicit, fully articulated agreement to extend the Master Agreement in this way is no obstacle to this conclusion. An agreement to modify a contract may be proven circumstantially by the conduct of the parties. *E.g., Byers Transp. Co. v. Fourth Nat'l Bank & Trust Co.*, 333 F.2d 822, 825 (10th Cir.1964); *Recon Car Corp. v. Chrysler Corp.*, 130 A.D.2d 725, 729, 515 N.Y.S.2d 829, 833 (2d Dep't), *appeal denied*, 70 N.Y.2d 612, 518 N.E.2d 7, 523 N.Y.S.2d 496 (1987). MM & P points out that it suited MTL's purposes in 1982 for the Sealift Agreement to extend the term of the Master Agreement. MTL expected that MM & P would perform its side of the bargain through the entire term of the Sealift Agreement; indeed, MTL *needed* MM & P's cooperation after June 15, 1984, in order to hold labor costs firm for the Navy. Evidently, by June 1984, MTL had decided that it could manage without the union, but there is no credible evidence that MTL contemplated this step or communicated it to MM & P in the autumn of 1982. Recognizing the district court's opportunity to assess the witnesses' credibility, *see Marine Transp. Lines*, 696 F.Supp. at 19, we are convinced that Judge Conboy's decision concerning the scope of the Sealift Agreement was not clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Unitec Corp. v. Beatty Safway Scaffold Co.*, 358 F.2d 470, 474 (9th Cir.1966).

MTL has repeated on appeal the arguments that it presented to the district court. We agree with most of Judge Conboy's discussion of these points and will not

add our own. However, one apparent "anomaly" received particular attention in oral argument before us and deserves more discussion here. This concerns the significance of the fact that, on January 1, 1983, and again on January 1, 1984, pursuant to the Master Agreement, MTL increased the rate at which it contributed to the MM & P's Health and Benefit Plan.

MM & P claimed at trial that MTL and MM & P had agreed during the 1982 negotiations to "lock in" *all* of Schedule A's labor costs; this claim supposedly supported the union's argument that the Sealift Agreement incorporated the entire Master Agreement. MTL's theory of the case was that the Sealift Agreement had not incorporated the entire Master Agreement. Therefore, in response to the union's claim, MTL argued that only the four, specified items had been locked in; it pointed to its increased contributions to the Health and Benefit Plan as evidence to support this argument. *Marine Transp. Lines,* 696 F.Supp. at 20. Judge Conboy agreed with MTL that MM & P had agreed only to wage reductions, but he went on to say: "Accordingly, this line of contention and proof is irrelevant to the outcome of the action." *Id.* MTL complains that this legal conclusion conflicts with the court's own factual finding. It follows, continues MTL, that Judge Conboy's factual finding conflicts as well with his ultimate conclusion that the Master Agreement was extended.

Judge Conboy's use of the word "accordingly" telescoped and somewhat obscured his reasoning; further explanation will, we hope, clarify the point. The Sealift Agreement modified the Master Agreement, as it applied to the Sealift tankers, in six distinct ways—the four wage and benefit reductions, the extension until May 7, 1985, and MM & P's right to shift costs—and left the rest of it unmodified. As the district court pointed out in another context, " '[m]odifications do not necessarily abrogate the original contract entirely; indeed, the terms of the old contract are still to be followed so far as not changed or as inconsistent with the new terms.' " *Id.* at 16 (quoting *Robinson v. Crosson,* 149 Colo.

235, 238, 368 P.2d 791, 792–93 (1962)); *see also Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 776 F.2d 198, 208 (7th Cir.1985) ("A modification of a contract is a change in one or more respects which introduces new elements into the details of the contract, cancels some of them, but leaves the general purpose and effect undisturbed."); *Beacon Terminal Corp. v. Chemprene, Inc.,* 75 A.D.2d 350, 354, 429 N.Y.S.2d 715, 717–18 (2d Dep't) ("The modification of a contract results in the establishment of a new agreement between the parties which *pro tanto* supplants the affected provisions of the original agreement while leaving the balance of it intact."), *appeal denied,* 51 N.Y.2d 706, 413 N.E.2d 369, 433 N.Y.S.2d 1026 (1980). Among the provisions of the Master Agreement that the Sealift Agreement did *not* modify were the scheduled increases in MTL's contributions to the Health and Benefit Plan. MTL did no more than fulfill an existing obligation when it increased its contributions to the Plan—an obligation that was carried over, unchanged, from the original Master Agreement.

Thus, it was *MM & P*'s line of contention and proof that appeared irrelevant to the outcome of the case—or, if relevant, then of very little probative value. The ultimate issue was whether MTL and MM & P intended to extend the duration of the Master Agreement with respect to the Sealift tankers when they concluded the Sealift Agreement. The union would have gained little from proving that they agreed to lock in all of the items on Schedule A, rather than just the four items specified by MTL. Consequently, MTL gained little from refuting MM & P's argument; in that sense, MTL's proof was irrelevant.

Judgment affirmed.