MARINE TRANSPORT LINES,
INC., Plaintiff,

v.

INTERNATIONAL ORGANIZATION OF
MASTERS, MATES, &
PILOTS, Defendant.

No. 85 Civ. 1360 (KC).

United States District Court,
S.D. New York.

Sept. 29, 1988.

Charles Calvarusso, Morgan, Lewis and Bockius, New York City, D. Michael Underhill, Morgan, Lewis and Bockius, Washington, D.C., for plaintiff.

Seymour M. Waldman, Vladeck, Waldman, Elias and Engelhard, P.C., New York City, Michael H. Gottesman, Bred Hoff and Kaiser, Frank Petramalo, Jr., Gordon and Barnett, Washington, D.C., for defendant.

## OPINION

CONBOY, District Judge:

In the early 1980s hard times fell upon the American maritime shipping industry. The international market for such services was being increasingly dominated by foreign carriers, principally, it was thought, because labor costs on American vessels made them noncompetitive. In such circumstances, the shipping companies and unions sometimes found themselves in common distress at the prospective loss of contracts and jobs. In extreme circumstances, imminent bankruptcy of the company spurred the union to agree to drastic reductions in the wages and benefits of its members in order to avert the dual disaster of company collapse and discharge of ships' crews. The matter before the court is such a case.

The plaintiff shipper told its unions, including the defendant, that a contract it had with the Navy to manage nine Sealift vessels would not be renewed routinely by the Navy. To secure the renewal, the plaintiff determined that it must offer to

the Navy a substantial reduction in labor costs. The defendant union orally agreed to the reductions for a two year period, thereby protecting the jobs of the deck officers on those nine ships, and the shipper consequently managed to secure its contract with the Navy for another two years. At a subsequent date during this two year term, the Master Collective Bargaining Agreement between the shipper and the union, covering all of the shipper's vessels, including the nine Sealift vessels, was by its terms scheduled to expire unless renewed. The shipper declined to negotiate a renewal, and later signed a new collective bargaining agreement with a rival union. On the final day of the Master Collective Bargaining Agreement, the shipper sent a letter to all deck officers on its vessels, including the nine Sealift ships, and advised them that the defendant union was no longer their bargaining agent, and set forth unilateral terms and conditions for continued employment.

The central issue remaining in the trial of this case is whether the oral "Sealift Agreement" modified and extended the "Master Agreement," with respect to the Sealift vessels, as the defendant union contends, or whether the Sealift Agreement merely incorporated necessary terms of the Master Agreement and existed independent of it, as the shipper contends. On this critical question, it should be noted at the outset that a written draft of the oral Sealift Agreement does not explicitly incorporate the Master Agreement, but does explicitly refer to certain of its clauses.

The plaintiff, Marine Transport Lines, Inc. ("MTL" or the "Employer") instituted this action for a declaratory judgment that its collective bargaining agreement with the defendant, International Organization of Masters, Mates, & Pilots, AFL–CIO ("MMP" or the "Union"), terminated at midnight June 15, 1984. In an Opinion filed June 6, 1986, the late Honorable Edward Weinfeld, U.S.D.J., granted MTL summary judgment declaring that the collective bargaining agreement between the parties (the "Master Agreement") expired according to its terms on June 15, 1984. *See Marine Transp. Lines v. Internation-*

*al Org. of Masters, Mates, & Pilots*, 636 F.Supp. 384, 389 (S.D.N.Y.1986). Judge Weinfeld also granted summary judgment to MTL dismissing the Union's first counterclaim, that the Master Agreement was extended for all purposes by its terms, *see id.*, summary judgment dismissing the Union's third counterclaim, that the Union may recover for breach of the Master Agreement on a theory of promissory estoppel, *see id.* at 391, and judgment on the pleadings dismissing the Union's fourth counterclaim, based on a theory of tortious interference with contract. *See id.* at 392. Judge Weinfeld refused to grant summary judgment on the Union's second counterclaim. *See id.* at 390.

The second counterclaim involves the oral agreement entered into between the parties, called the "Sealift Agreement." *See id.* at 386.

> During the effective period of the Master Agreement, in the fall of 1982, MTL requested wage and benefit concessions by Union members working aboard nine vessels operated by MTL under contract with the United States Navy's Marine [sic] Sealift Command. MTL told the Union that the Navy would not renew its contract with MTL unless the Union agreed to the requested labor cost reductions.

*Id.*

This court conducted a bench trial of the Union's second counterclaim over eight trial days, from June 20, 1988 to July 1, 1988. This Opinion constitutes the court's findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52.

Pursuant to an Order filed December 22, 1986, on the consent of the parties, the court must decide whether the Sealift Agreement extended the entire Master Agreement (as modified by the oral agreement) between June 16, 1984 and May 7, 1985 with respect to the Sealift vessels. If the court decides that question in the Union's favor, all remaining issues (breaches, defenses, remedies) will be submitted to arbitration. If the court decides the initial question in the Employer's favor, the court

will decide what breaches of the Sealift Agreement, if any, MTL committed between June 16, 1984 and May 7, 1985. In this latter event, the court will decide also whether MTL has any defenses to any breaches found. The issue of remedies, if appropriate, will be submitted to arbitration. On this question, if reached, the court will determine merely the period between June 16, 1984 and May 7, 1985 for which remedies are appropriate.

## BACKGROUND

### A. The Original Navy Contract

"The Union ... represents supervisory personnel, who are not covered by the National Labor Relations Act's guarantee of the right to collective bargaining." *Marine Transp. Lines*, 636 F.Supp. at 388 (citing, *inter alia*, 29 U.S.C. §§ 152(3), 152(11), & 164(a)). Nevertheless, the Union, which predates the National Labor Relations Act, has had collective bargaining agreements, the Master Agreements, with a substantial number of employers, including MTL, for many years. Although it is unclear when the parties first made a labor agreement, MTL and the Union had had a Master Agreement at least as far back as the middle of the 1960s. MTL and the Union entered into a Master Agreement to run from June 16, 1972 to midnight June 15, 1975. Thereafter, MTL and the Union renewed the Master Agreement in 1975, in 1978, and in 1981. Each renewal covered a three-year period.

During the course of the '72–'75 Master Agreement, MTL learned of the opportunity to bid on a contract to manage a group of nine vessels, the Sealift vessels,[1] for the United States Navy. However, a major impediment existed to MTL's ability to bid on the contract being offered by the Navy. Specifically, in 1965, the Union had struck, seeking employment for a fifth deck officer per ship. At the time, each ship was manned by four MMP members (as well as employees of other unions). The Union won this concession, and all MTL ships were carrying five MMP members in 1974. To secure the contract for the Sealift vessels, MTL had to get MMP to agree to a cap of four Union members per ship.

MTL approached the Union. The Union recognized that accommodation was necessary, for it no longer enjoyed the virtual monopoly position that it had enjoyed for almost one hundred years. *See* Trial Transcript[2] at 177–78. The Union agreed to modify the Master Agreement, as it applied to the Sealift vessels, so that MTL could bid on the Sealift vessels, or tankers, in accordance with the Navy's terms.

MTL won the contract, and in 1974, entered into a five-year contract with the Navy (the "Navy Contract") to manage the Sealift tankers. MTL routinely submitted to the Navy a document referred to as "Schedule A," the principal device to identify and control labor costs on the vessels, for which the Navy would be billed. Schedule A enumerates the various items calculated to establish the bulk, if not all, of the Contractor's reimbursable labor costs, what the Navy refers to as "total wages," *see* Defendant Exhibit[3] 15 at Art. 31(b): Non–Watch Allowance, Basic Monthly Wage, Overtime, Pension & Welfare, Vacation, Training Program, Feinberg Award,[4] and Payroll Taxes. In other

---

1. The United States Navy has described these vessels in this way:

    The nine Sealift Class tankers are handy-sized ... clean coated product carriers propelled by twin medium speed diesels. These ships were designed and constructed ... specifically to meet long term Military Sealift Command (MSC) requirements for economical handy size tonnage and have been continuously employed in MSC clean product service on a worldwide basis since their delivery to the Government under demise (bareboat) charters in 1974–5.

    Defendant's Exhibit 14 (Memorandum for file, dated Nov. 29, 1982, by Frances C. Gapp &

    Charles C. Metzger, Contract Specialists, U.S.N.) at para. 2.

2. The court will henceforth refer to the Trial Transcript as "Tr. __."

3. The court will refer henceforth to Union exhibits as "Dx __," and to MTL exhibits as "Px __."

4. The "Feinberg Award" is a contribution MTL makes to the Union's pension and welfare funds based on a formula involving vacation days. It is a reduced percentage of contributions made for working days. *See, e.g.*, Dx 55 (Deposition of Thomas Murphy) at 223–25.

words, the usage of Schedule A by the parties to the Navy Contract established each of the enumerated labor cost items as components of the single contract construct, "total wages."

The manning concession made by the Union (four Union members instead of five) continued in force on board the Sealift tankers through the 1975–'78 and 1978–'81 Master Agreements. The court notes parenthetically that MTL secured an extension of the original Navy Contract for two years, from 1979 to 1981. Whenever the Master Agreement created different labor costs, whether wages or fringe benefits, MTL submitted a revised Schedule A to the Navy. *See, e.g.,* Dx 32 (Letter from J.P. Hale, MTL Contract Specialist to Commander, MSC (May 6, 1982)) & Dx 33 (Letter from F.T. Hayden, MSC Director, Chartering and Contract Operating Div. to MTL (undated)); Tr. 963–64 (testimony of James H. Rand, MTL President) ("It was MTL's practice, if not the—a requirement of the contract, to provide Military Sealift Command with a revised schedule or a new Schedule A–1 or A–2 each time there was a material change in our costs. And when I say material change, I'm thinking most keenly of a new contract with our labor unions. Those contracts required approval by the Navy."); Dx 15 at Art. 6(k) ("All renewals or modifications of labor agreements negotiated by the Contractor covering the operation of the tankers under this Contract shall be submitted for approval by the Government before the same shall be binding on the Government."). MTL was awarded, without competitive bidding, two two-year extensions of the Navy Contract, running from May 7, 1979 to midnight May 6, 1981, and from May 7, 1981 to midnight May 6, 1983.

## B. The 1982 Initial Discussions With MMP

In the early years of the 1980s, as has been noted, the American maritime industry found itself sailing upon turbulent economic waters. By 1982, according to the United States Navy, the American flag maritime industry faced an "extreme recession." Dx 14 at para. 3(b); *see also* Dx 45 (telex from MTL to all MTL vessels (June 15, 1984)) at 1–2 ("[T]he U.S. flag shipping industry has experienced a prolonged depression."). This woeful state of affairs created a strong buyer's market, reflected in various requests for proposals ("RFP"), or solicitations for contract bids, that the Navy issued in 1982. MTL bid unsuccessfully on two "major" ship procurement programs, as well as a third Navy contract, during the summer of 1982. *See* Dx 41 at 2 (Letter from James H. Rand to MMP (Jan. 7, 1983)). MTL "bec[a]me aware" that a union with which it did not contract "made substantial concessions to the companies with which it has collective bargaining agreements.... These concessions, which were applicable to both [sic] deck, engineering and radio officers, had the effect of reducing charter hire [costs] to the Navy by thousands of dollars per day." *Id.* In fact, in 1982 the Navy awarded contracts to ships having contracts with the MMP only because the United States Government faced "substantial prospective losses" if the Navy awarded those contracts to others. *See id.*

MTL believed that the Navy would not routinely renew its Navy Contract in 1983, but would instead put it up for competitive bidding, and indeed, it learned that the Navy intended to issue an RFP for the Sealift tankers contract, the Navy Contract. MTL knew that it could not be the successful bidder without reducing its labor costs.

MTL expressed grave concern about the potential loss of the Navy Contract. "In ordinary times, the loss of this business would be hard for MTL to bear and might well result in the financial insolvency of MTL." *Id.* Loss of the Navy Contract would "reduce MTL's operating cash flow of [sic] 40–50%." Px 30 at 2 (Memorandum from James H. Rand to file (Dec. 2, 1982)). In addition, MTL faced "special circumstances" during 1982. *See* Dx 41 at 2. Loss of the Navy Contract most likely would have caused a commercial lender, Irving Trust Company (coincidentally the trustee of a partnership owning the Sealift tankers, *see* Dx 14 at para. 2(a)), to refuse

to lend ten million dollars to MTL to assist MTL to acquire a United States flag bulk-carrier named the "Marine Princess." *See* Dx 41 at 3; Px 30 at 2. In turn, MTL would lose fifteen million dollars that another lender was prepared to make available, *see* Dx 41 at 3, and thus would be unable to purchase the ship. Additionally, MTL's corporate parent, GATX Corporation, which had announced on June 28, 1982 that it would "distribute the stock of MTL to the GATX shareholders at or near the end of 1982," would not "spin off" MTL. *See id.* at 2–3. Instead, GATX "would proceed to liquidate MTL's assets promptly." *Id.* at 3; *see id.* at 2. GATX was determined "to withdraw from the ocean shipping industry." *Id.* at 2. "[T]he non-extension of the Navy Contract would have had a *catastrophic* effect upon [MTL]." Dx 42 (draft Memorandum of Sealift Agreement accompanying June 6, 1983 letter from Thomas E. Murphy, MTL Manager, Marine Personnel Div. to Captain Robert J. Lowen, International President, MMP) (emphasis added).

MTL concluded that it needed to reduce Schedule A's total wages by approximately three thousand dollars per day in order for the Navy to routinely renew the Navy Contract without resorting to the RFP process. Before MTL could present a reduced Schedule A to the Navy, it of course needed to secure concessions from the four unions supplying manpower to the Sealift tankers.

Thomas Murphy, at the time MTL's "manager of the Marine Personnel Department," Tr. 555, was responsible for the Employer's collective bargaining. *See id.* Murphy determined that four steps were necessary if MTL was to achieve the necessary labor cost savings: wages must be "rolled back" to their level of June 16, 1981, and remain at that level through the duration of the upcoming extension; a certain allowance contained in the Master Agreement, called the "diesel and automation allowance," must be inapplicable to the Sealift tankers; vacation entitlements must be cut drastically (from 30 to 13 days for each 30 days of employment for ship "Masters," or captains, and from 27 or 26 days to 13 days for each 30 days of employment

for other MMP members (collectively the "licensed deck officers," or "L.D.O.s"), *see* Dx 43 at § XXVIII(1)(b) (1981–'84 Master Agreement)); and necessary job-related travel must be made by economy class, rather than first class. *See* Tr. 557–58. These reductions, by themselves and through their "rippling effect" on wage-driven benefits, such as pension and the Feinberg Award, would allow MTL to remain competitive for the Navy Contract. Having already met with representatives of one of the other three unions providing manpower for the Sealift tankers, Murphy called on Captain Robert Lowen, International President of MMP, in the early fall of 1982.

Lowen understood that MTL wanted, in effect, to wipe out the aggregate compounded wage increase of 27½% since June, 1981 and cancel the 7½% increase anticipated for the following June. Additionally, cost of living increases due would be eliminated. *See* Tr. 197–98. Capt. Lowen characterized the wage reductions aptly as "brutal, brutal hits," *id.* at 198, "almost unbelievable hits." *Id.* Lowen was concerned also that the reduction in vacation days would be extremely problematic, because it tied in to credit towards pension. *See id.* at 199. Murphy, however, told Lowen of MTL's lack of success earlier that year on other Navy contracts, and grimly warned Lowen that MMP

> either swallowed very, very hard, extended the contract for two years by amending at least the provisions that [MTL] w[as] worried about, and we had the jobs for two more years. Or, he said, [MTL and MMP] take the chance of putting [the 1983–'85 extension of the Navy Contract] out to bid and we know that whatever [the cost] is now, it's going to end up less, and [MMP] do[es]n't have the assurance of the jobs.

Tr. 203–04.

Lowen, Murphy, and possibly others had more discussions about these proposals during the month of October. *See* Tr. 205. An important face-to-face meeting occurred

subsequently, on November 15, 1982,[5] *see* Tr. 671; *id.* at 997, at MMP's headquarters. Lowen, Murphy, James Rand, MTL's President, and Allan Scott, MMP's Vice President, attended this meeting. *See* Tr. 205. The parties discussed MTL's proposals, "which in affect [sic] w[ould] amend the [Master Agreement] so that we could remove the Sealift ships for a period of two years, and lock them up, so that they would not be touched," according to Captain Lowen. Tr. 206. Lowen apparently was shown a copy of a letter MTL had submitted to the Navy on November 12, in which MTL falsely stated that it already had its unions' agreement to wage concessions, *see supra* note 5, and offered to hold Schedule A "firm for the option period 1983–1985." *See* Dx 2 (Letter from H.A. Downing, MTL Executive Vice President, to Admiral K.J. Carroll, Military Sealift Command (Nov. 12, 1982)). Lowen asked whether the escalation provision of the original Navy Contract would apply. One of MTL's representatives told him it would not. *See* Tr. 346 (quoting Lowen deposition testimony). This meant that MTL would not be able to submit revised Schedules A to the Navy during the 1983–'85 option period for the Navy Contract. MTL would continue to recapture actual costs above the Contract Price through escalation, but the amount recoverable through the escalation provision of the Navy Contract would be frozen. *See generally* discussion *infra* at 20–28. Lowen told Rand and Murphy that he found this "hard to believe." *See id.* at 347 (quoting Lowen deposition testimony).

Nevertheless, at the end of this meeting MMP agreed to accept MTL's proposals. MMP did, however, manage to extract one concession from MTL. MMP, as well as the other unions, apparently, negotiated the right to shift costs around, to make "future changes in the various benefits as [MMP] may desire so long as the total compensation remains unaffected." Dx 6 at 2 (Letter from James H. Rand to Commander, Military Sealift Command (Nov. 22, 1982)). The parties did not execute a writing to reflect their agreement.

## C. MTL's Negotiations With the Navy

At the same time MTL was obtaining its unions' agreements to the concessions set forth above, it was engaged in discussions with the Navy regarding the 1983–'85 extension of the Navy Contract. As early as August 12, 1982, Rand discussed the extension of the Navy Contract with MSC officials. *See* Rand Dep. 51–52. In a letter dated October 26, 1982, MTL stated to the Navy its belief "that the Navy is considering putting the [Navy] [C]ontract out for bid in the near future." Dx 1 (Letter from H.A. Downing to Commander, Military Sealift Command (Oct. 26, 1982)). MTL asked the Navy to consider the proposal included in the letter before putting the contract out for bid. *See id.* The letter included two offers by MTL.

First, MTL submitted a *handwritten* revised Schedule A which reflected the concessions it was in the process of obtaining from its unions. The letter stated: "The changes in Schedule A (total wages) represented by these concessions (almost 35% of the total wages) reduces the operating costs by almost $1 million per Vessel per year as compared with our present Schedule A." *Id.* Michael C. Berkowitz, the composer of the October 26 letter, *see* Tr. 1114, then MTL's general counsel, *see id.* at 1112, asserted at the trial that he used the term "total wages" to "refer specifically to the Schedule A total wages from the [Navy] [C]ontract and so I used the term together with the Schedule A in the parenthesis to indicate that I was specifically referring to the Navy [C]ontract and that very limited definition, specific definition set forth I think in Article 31" of the Navy Contract. Tr. 1119. The "very limited," "specific" definition that Berkowitz referred to reads, in relevant part:

---

5. As the meeting between MTL and MMP occurred on the Monday following a key meeting between MTL officials and the Military Sealift Command, November 12, 1982, *see* discussion *infra* in the text at 15–16, MTL's statement to MSC in a letter dated November 12 that by then MTL had its "unions' agreement for the lower wages during the period[ of the 1983–'85 extension of the Navy Contract]," *see* Dx 2 at 1, was false.

[T]he term "total wages" includes but is not limited to basic wages, pension and welfare costs, vacation pay, and any other fringe benefits or other payments, paid as a result of collective bargaining agreements, and overtime at the agreed percentage of 120% of base wages for licensed officers, excluding Masters and Chief Engineers, and 100% of base wages for unlicensed personnel vice [sic] actual overtime for each department of the tanker, and related taxes, *all as set forth in Schedule A.*

Dx 15 (Navy Contract) Art. 31(b)(i) (emphasis added).

Second, MTL offered to restructure its contractual relationship with the Navy, proposing to incorporate into the Navy Contract some of the requirements the Navy had included in recent RFPs for other contracts. Tr. 1041. This second proposal "would have required a two party negotiation," *id.* at 1041–42, which the Navy rejected because, due to time constraints, "any negotiations about revisions in the [Navy] [C]ontract might lend the appearance of a quid pro quo." *Id.* at 1042.

Still, the Navy expressed interest in MTL's first proposal. *See id.* On November 12, 1982, Berkowitz and Captain Henry Downing, who was then an Executive Vice President of MTL, and MTL's second-ranking operating officer behind Rand, *see* Rand Dep. 8, traveled to the offices of the Military Sealift Command in Washington, D.C., to meet with MSC officials. *See* Tr. 43. They delivered to the Navy, on MTL's behalf, a letter from Capt. Downing in which MTL waived the ninety-day notice period contained in Article 4(b) of the Navy Contract.[6] *See* Dx 2 at 1; Dx 14 at Reference (A). MTL did this because the Navy was

required to give [MTL] a 90–day notice if they were going to put out a new RFP and our concern was that that requirement would force them to go ahead and put out a new RFP without having time to fully evaluate our offer to renew the

contract under the conditions that we were offering them.

Tr. 45. Although notice would have been due to MTL by February 7, 1983, *see* Dx 14 at Reference (A), receipt of the November 12 letter waiving notice apparently encouraged the Navy to move up the time when it would put out a RFP, because MTL later operated under the belief that the Navy would proceed to put out the RFP on December 1, 1982. *See* Tr. 216; *id.* at 593–94; *id.* at 676. In any event, there is no dispute that MTL was operating under severe time pressure, both from the Navy and from GATX.

Downing's impression of the November 12 meeting was that the Navy was "willing to continue the discussion" of MTL's proposal. Tr. 44. Because MTL had to act quickly, Downing and Berkowitz went immediately to counsel's offices at the conclusion of the meeting. *See* Tr. 1119–20. Berkowitz either wrote out "in longhand," or "dictated," *see* Tr. 1119–20, a letter to Admiral Carroll thanking MSC for the meeting. *See* Dx 2 at 1. Attached to the letter were two different typewritten proposed Schedules A. *See id.* (attachments). The letter advised MSC: "Both sets of figures [on the proposed Schedules A] are firm for the option period 1983–1985, and we have our unions' agreement for the lower wages during the period." *Id.* at 1.

On the following Monday, November 15, 1982, probably after meeting with Lowen, *see* discussion *supra* at 12–13, MTL sent MSC a telex in Capt. Downing's name, though Downing "probably" did not author the telex. *See* Tr. 52–53 & Dx 5. The telex stated that MTL was "pleased to advise that Schedule A, delivered with our letter [dated] 12 November 1982, is firm through May 1985." Dx 5.

The same day James Rand sent another telex to MSC. This telex notified the Navy in writing of an extra benefit MTL would confer in order to retain the Navy Contract

---

**6.** Article 4(b) reads, in relevant part:

The Government shall exercise ... options [to extend the Navy Contract] by giving notice confirmed in writing, not less than 90 days

prior to the termination of the then current contract period.

Dx 15 Art. 4(b).

for the next two-year period, *i.e.*, it would implement the new labor costs on January 1, 1983, rather than on May 7, 1983, when the 1983–'85 extension would begin. *See* Dx 3 ("We are pleased to report to you that our unions have agreed that the prices reflected in our letter [dated] 12 Nov 82 and hand delivered to your office on that day shall be effective as from 01 Jan 1983."). This was confirmed by letter the next day. *See* Dx 4 (Letter from J.H. Rand to Admiral K.J. Carroll (Nov. 16, 1982)).

Finally, on November 22, 1982, MTL sent MSC a letter, apparently authored solely by Rand, *see* Tr. 1063–64, with input from Murphy.[7] *See id.* at 1064. The November 22 letter represented official notification, as required by Article 6(k) of the Navy Contract, that MTL had "amended [its] union contracts," effective January 1, 1983. *See* Dx 6 at 1. The letter went on to list the modifications obtained, after which it stated: "All of the unions have agreed to hold total compensation levels firm through May 7, 1985, although we have agreed to such future changes in the various benefits as the unions may desire so long as the total compensation remains unaffected." Dx 6 at 2. MTL did not send a copy of this letter to MMP. *See* Tr. 221–22.

### D. The Second Round of Talks With MMP

After Lowen had agreed to MTL's proposal at the November meeting at MMP headquarters, MMP began notifying members of the Offshore Advisory Council of the terms Lowen had agreed to. *See* Tr. 211. "[I]t became apparent very rapidly that there was going to be a lot of trouble." *Id.* The entire MMP membership had recently approved a change in its rules, adopting what has been referred to as the "hardship rule." That rule states, in relevant part:

[T]he International President, in consultation with the Offshore Advisory Council [is provided] with ongoing authoriza-

tion to amend or defer the wages, hours or working conditions of the Master Offshore Contract for a financially ailing company signatory thereto, and the ongoing authorization to amend the agreement with an individual company with contract terms other than those of the Master Offshore Contract for the specific purpose of staving off financial insolvency.

The company's financial hardship shall be proved to the satisfaction of the Organization prior to any amendment or deferral of contract terms. Any such amendment or deferral shall only be for a temporary period of time as determined by the President and any such amendment may be made with or without security and for other good and valuable considerations.

Dx 53; *see* Tr. 184–85; *id.* at 214. The hardship rule provided the only authorization for the International President, in consultation with the Offshore Advisory Council, to amend a previously ratified contract. *See* Tr. 182–85. Members of the Offshore Advisory Council complained, correctly, that MMP had not received any written evidence to support MTL's claim of hardship. *See id.* at 212–15.

After speaking with counsel, *see id.* at 213, Capt. Lowen, on his way to his home in California for Thanksgiving, asked Lloyd Martin, MMP's International Secretary–Treasurer, *see* Martin Dep. 5, to call MTL to tell them that Lowen believed he may have acted improperly in unilaterally, and without documentary support, agreeing to MTL's proposals. *See* Tr. 213–14. Martin called Murphy the Wednesday before Thanksgiving, November 24. Murphy testified that Martin said he would see Lowen in San Francisco and would try to get written confirmation of MMP's agreement, which MTL had to give to the Navy. *See* Tr. 676.

---

7. Murphy testified that he did not speak directly to Rand. Rather, Murphy discussed the union agreements orally with Berkowitz. *See* Tr. 582–84. Berkowitz apparently spoke with Rand, because he testified that he did not recall drafting the November 22, 1982 letter (Dx 6). *See* Tr.

1137. Murphy, coincidentally, "believe[s]" he saw the November 22 letter before it was mailed, *see* Tr. 582, but does not have a recollection of "reviewing the letter" before it was mailed. *Id.* at 584.

The day after Thanksgiving, November 26, Martin called Murphy again. *Id.* Martin said he was having lunch with Lowen and that Lowen had asked Martin to call Murphy to say he could not go through with the deal. *Id.* Murphy was "shocked, surprised." *Id.* Martin said Lowen would not speak to Murphy directly. *See id.* Murphy called Rand to inform him of this turn of events. *See id.* at 977. Rand spoke with Lowen on the telephone. *See* Tr. 215–16; *id.* at 978. Rand "demanded a meeting." *Id.* at 978. Rand "didn't offer [Lowen] a chance to say very much." *Id.* Rand "was willing to go anywhere to have the conversations," and "proposed to come out to San Francisco and see [Lowen]." *Id.* at 979. The time pressures on MTL were great because MTL had been told by MSC that it should have written confirmation of the unions' agreements to MSC by November 26. *See* Px 30 at 1.

The meeting occurred Thanksgiving weekend,[8] at the offices of MMP's San Francisco local. Lowen, Martin, and Bill Larsen, MMP's west coast Vice President, *see* Tr. 220, met Rand and Murphy. Martin later stated that Rand "was in a very high tension hyperventilation [sic] state of mind and almost to the point where we thought he might pass out from sheer excitement and tension." Martin Dep. 82. Lowen described Rand's presentation as "passion[ate]." *See* Tr. 220. Both Martin and Lowen agree Rand stated something to the effect that GATX would liquidate MTL if MTL did not secure the extension of the Navy Contract. *See* Tr. 217–18; Martin

Dep. 82; *see also* Dx 41 (Letter from Rand to Lowen at 3 (Jan. 7, 1983)) (ultimate result of chain of consequences that would occur if MTL did not secure the extension of the Navy Contract would be that "GATX would proceed to liquidate MTL's assets promptly"); *cf.* Tr. 979 (Rand testimony) ("I took the opportunity to bring [Lowen] up to date with my conversations with MTL's sole shareholder and was able to share with him my own estimation of what the consequences, in a dim natural sort of sense, one thing leading to another, what the consequences might be on the company of Captain Lowen reneging on his agreement, we not getting the renewal on the [Navy] [C]ontract.").

After Lowen had discussed the matter with Martin and Larsen to satisfy himself that MTL qualified under MMP's hardship rule, *see* Tr. 220, Murphy gave Lowen a draft of a letter, which had been composed either by Rand or Berkowitz, *see id.* at 593–94, that MTL needed to provide to MSC. *See id.* at 226. Murphy stated that MTL was "very anxious" to have Lowen provide this letter. Tr. 593. Lowen provided the letter, which stated that Lowen had reviewed MTL's November 22 letter to MSC, and that the November 22 letter correctly summarized the amendments made to the Master Agreement, *see* Dx 39, typing it himself. *See* Tr. 226; discussion *supra* note 8. Lowen hand delivered the letter right there, because Rand and Murphy indicated "that they could not leave that office without hand carrying the letter." Tr. 230. Furthermore, Rand agreed

---

**8.** While Lowen believes the meeting occurred on Sunday, *see* Tr. 218, and Lloyd Martin, who also attended the meeting, *see* Tr. 220, believes it took place on Saturday, *see* Martin Dep. 81, both stated that the MMP San Francisco office, where the meeting was held, was closed. *See* Tr. 226 (Lowen); Martin Dep. 81. On the other hand, Murphy contradicted himself, at first stating that the meeting took place "[t]he weekend following Thanksgiving," Tr. 675, but later stating that the meeting occurred on Monday, November 29. *See id.* at 677. Rand testified that the meeting occurred on the 29th. *See id.* at 979. Rand and Murphy's version appears at first to be supported by a letter of that date, discussed *infra* in the text at 21–22, that Lowen provided Rand. *See* Dx 39. Actually, the letter also supports Lowen and Martin's version.

Lowen testified that he typed the letter himself. *See* Tr. 226. Martin testified that while one secretary was called in to the office, she did not do any typing. *See* Martin Dep. 81. The document supports this. On inspection, it is obvious that the letter "d" in the word "amendments" beginning at the end of the third line of text of the letter is typed over either an "e" or an "s." *See* Dx 39. No competent secretary would leave a letter that way. Second, there are no typist's initials on the lower left-hand side of the letter, where they would appear normally. Further, MMP wanted written confirmation of Rand's explanation of the consequences to MTL from loss of the Navy Contract, to comply with the hardship rule. One could not be composed at the meeting because there was no secretarial help available. *See* Tr. 231.

to provide MMP with a written explanation of the potentially disastrous consequences that MTL would likely suffer if it lost the Navy Contract. *See* Tr. 231. The letter was eventually provided. *See* Dx 41.

## E. The 1983–'85 Navy Contract Extension Confirmed

On November 29, 1982, two Navy contract specialists signed a memorandum for internal files on the subject of "Justification for Exercise of Third Option to extend Contract for Operation of the Sealift Class Tankers." *See generally* Dx 14. The memorandum referred, *inter alia*, to MTL's November 12 letter stating that "[b]oth sets of figures[, contained in Schedules A–1 and A–2,] are firm for the option period 1983–1985." *See* Dx 14 at para. 3(b). The memorandum stated: "[U]nder the revision of MTL's Schedule A which is to become effective on 1 January 1983, total wages (including fringe benefits) will actually decrease by approximately 30 percent in comparison with the currently effective Schedule A." *Id.* para. 3(b). After making various cost calculations and comparisons, *see id.* paras. 7–11, the memorandum concluded that "exercise of the [two-year] option [wa]s the most advantageous method of fulfilling the Government's need" for the services the Sealift tankers provided. *See id.* para. 14. Specifically, because the figures on the new Schedule A would not change during the period of the extension, and the base "Contract Price" could "be estimated with a fair degree of certainty," *see* Dx 14 at para. 3(a), the Navy calculated the two-year "per diem," or total cost to the Navy, of the extension. *See id.* at para. 7.

On December 1, 1982, Military Sealift Command sent MTL a telex notifying MTL of the Navy's decision to exercise its third option for the Navy Contract, for the period May 7, 1983 to midnight May 6, 1985. *See* Dx 7. Rand sent a message to all the Sealift tankers the next day to detail the concessions. *See* Px 49 Ex. I at 4 (Telex from Lowen to Sealift Deck Officers (Dec.

24, 1982)). The Navy telex was followed by a letter dated December 9, 1982 [9] from Vice Admiral Carroll. *See* Dx 8. The letter "serve[d] to confirm essential points of understanding and agreement regarding the Government's acceptance of certain voluntary proposals recently submitted by MTL affecting manning and contract payments effective as of 1 January 1983." *Id.* at 1. MSC accepted "the revision of Schedule A recently submitted by MTL marked and identified as 'Exhibit A–2 for 1983–1985.' ... It is understood this Revised Schedule A will remain firm from 1 January 1983 through May 1985." *Id.* at 2.

On December 22, 1982, Rand sent a letter to the Commander, Military Sealift Command, acknowledging receipt of Vice Admiral Carroll's letter and agreeing to the Navy's terms. *See* Dx 9. MTL specifically "thank[ed] MSC for its acceptance of revised Schedule A." *Id.* at 2.

## F. The Foreign Articles Problem

On Christmas Eve, 1982, Capt. Lowen sent a telex to all Sealift Deck Officers to explain the circumstances leading to, and to restate the particulars of, MMP's concessions to MTL. *See* Px 49 Ex. I; Px 50. The telex urged

all Masters that the terms and conditions under which officers and crew signed Articles should be adhered to until Articles are broken in a U.S. port. Upon voyage completion, or until the terms of the Articles run in the event of non-return in accordance with the relevant portions of the U.S. Code. [sic] *If there is a dispute concerning overpayment by a Master, MTL and the Navy can argue out whether or not a Master can be ordered to violate a stature [sic] of the United States Code.*

Px 49 Ex. I at 4 (emphasis added). Capt. Lowen in substance said that it would be illegal for MTL to impose the wage reductions on those men working on board any of the Sealift tankers as of January 1, 1983.

---

**9.** The copy of the letter provided to the court is undated. *See* Dx 8. The date is taken from Dx

9, Rand's responsive letter of December 22, 1982. *See id.*

MTL soon recognized that, in its haste to secure the extension of the Navy Contract, it had agreed to reduce wage costs to the Navy as of January first, despite its obligation to pay current wages to the employees working under the "foreign articles," to which Lowen had referred in his December 24 telex, for the duration of their then current voyages. On December 30, 1982, J.M. MacAulay, Fleet Director for the Sealift vessels, *see* Tr. 264–65, wrote MSC to advise MSC: "As some vessels are presently on foreign articles operating offshore, there will be some time delay for some vessels until their return to a U.S. port or when one year articles are terminated." Dx 10 at 1 (Letter from J.M. MacAulay to Department of the Navy (Dec. 30, 1982)). MacAulay apparently had been given the task of persuading the Navy to absorb these labor costs, because he had played no role in negotiating the extension of the Navy Contract. *See* Tr. 300. The letter stated that crew members under foreign articles "will have legal rights to entitlements of existing pay scale, which will present some difficulties in instituting the new [S]chedule [A] on 1 January 1983." Dx 10 at 1. MTL predicted an average cost overrun "of approximately 4 months when wages of those existing crew members now on foreign articles will continue." The letter ended with MTL asking the Navy to modify the Navy Contract: "Your understanding and agreement to the schedule we intend to follow with the Sealift vessels will be greatly appreciated." *Id.* at 3.

Admiral Carroll responded to MacAulay's letter in a letter dated January 19, 1983.[10] *See* Dx 11. He stated, in relevant part, that

MTL notified MSC in previous correspondence, particularly your letter of November 22, 1982, that the effective date for the reduced wages identified in Exhibits A–1 and A–2 for 1983–1985 attached to your letter of November 12, 1982 would be 1 January 1983. The option to extend the contract period for an additional two years was predicated on this under-

standing. As MSC has historically paid all wage increases in accordance with Article 31, Escalation, on the effective date stated in existing collective bargaining agreements, we do not agree with your position that the new wage rates will not be effected until Foreign Articles are broken.

*Id.*

Rand testified that within a few days of receipt of the January 19 letter, he called Admiral Carroll to explain MTL's position, and, after a briefing from his attorney, gave Admiral Carroll "an informal legal briefing on foreign articles." *See* Tr. 1103–05. Rand gave the following testimony:

Q. Admiral Carroll told you he was going to go ahead and pay the bill?

A. Right.

Q. He didn't tell you why he was going to pay?

A. No.

Q. Did you have an impression from Admiral Carroll as to why he agreed to pay the bill after telling you in a letter just a few days before that he wasn't going to pay the bill?

A. Because he admitted he owed it.

Tr. 1106.

This testimony is not entirely consistent with the documentary evidence presented to the court. On February 11, 1983, Rand signed a letter to Vice Admiral Carroll. *See* Dx 12. The letter began: "In view of the assorted complexities contained in the [Navy] Contract, I have asked my staff to assess the contents in your letter of 19 January 1983 and prepare for me a formal response." *See id.* at 1. The letter acknowledged that the problem of reducing the wages of crew members on foreign articles "was unexpected by either MTL or its unions at the time of our proposal." *Id.* at 3. MTL estimated the cost difference to be "between $600,000 and $900,000." *Id.* at 4. "MTL c[ould] ill afford to suffer a loss of this magnitude." *Id.* MTL "re-

---

10. The court's copy is not clear as to the date. The date is taken from MMP's index of trial exhibits.

quest[ed] relief from the government on a dollar for dollar basis in lieu of MTL attempting to absorb these extra ordinary costs." *Id.* MTL felt it "should not be held liable for the legally binding implications of the [foreign] articles which were not anticipated by either party at the time the proposal [for extension of the Navy Contract] was accepted." *Id.*

On April 15, 1983, Admiral Carroll responded to the February 11 letter. *See* Dx 13. The letter granted MTL's request for monetary relief, "estimated to amount to $600,000." *Id.*

## G. The June 1983 Memorandum

In a letter dated June 6, 1983, Thomas Murphy wrote Capt. Lowen to inform him that "Military Sealift Command require[d] formal Agreements respecting the contract changes pertaining to the Sealift Tankers. This [wa]s necessary for billing purposes." Dx 42. The letter included a draft agreement, reproduced in the margin.[11] *See id.*

The draft had been prepared by Murphy and Berkowitz. *See* Murphy Dep. at 146–47; Tr. 605. Lowen testified that he agreed that the draft embodied MMP's agreement with MTL. He would have signed the June 6 draft but for the inclusion of a paragraph that is irrelevant to this action. *See* Tr. 384–85; *id.* at 424. The irrelevant paragraph, however, made Lowen "s[ee] red." *Id.* at 235–36. For that reason, the June 6 draft "did not get signed. And [Lowen] could think of no other document that was signed." Tr. 235. Curiously, it appears that "there was never any communication between the parties [on the subject of the draft] after" the June 6 letter was sent. *See* Tr. 601 & 619 (Murphy testimony). It also appears that there never were any conversations with the Navy about the fact the draft agreement had not been signed. *See* Murphy Dep. 121. Nevertheless, the concessions that had been negotiated in 1982 were implemented. *See* Tr. 236.

11. The June 6 draft reads, in relevant part:

DRAFT
MEMORANDUM OF AGREEMENT

This AGREEMENT made as of the 1st day of January, 1983, by and between Marine Transport Management, Inc. (formerly named Marine Transport Lines, Inc.) (the "Company") and the International Organization of Masters, Mates and Pilots, (herein "Organization").

WITNESSETH THAT

WHEREAS, the Company's contract (the ["]Navy Contract") with the United States of America to operate nine Sealift class tankers (the "Tankers["] ) has been extended to and including May 7, 1985;

WHEREAS, the Organization has been recognized as the sole collective bargaining agent for the licensed Deck Officers aboard all vessels operated by the Company including the Tankers and the parties have entered into a standard collective bargaining agreement (the "Standard Agreement") dated June 16, 1981;

WHEREAS, the Company has represented to the Organization that in the Company's Judgement the Navy Contract would not have been extended if the terms and conditions of the Standard Agreement were applicable to the Navy Contract for the term of this Agreement and, because of the planned spin-off of the Company from it's [sic] corporate parent and a pending financing the non-extension of the Navy Contract would have had a catastrophic effect upon the Company; and

WHEREAS, in light of the foregoing circumstances the parties wish to effect certain changes in the wages, hours and working conditions which shall be applicable to the licensed Deck Officers employed aboard the Tankers;

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency whereof are acknowledged, it is hereby agreed as follows[:]

1. The term of this Agreement shall commence as of the date first written above [and] shall end on May 8, 1985.

2. All wages, overtime, penalty rates etc. applicable to the Tankers shall be and shall remain during the Term the rates that were in effect on June 16, 1981.

3. The diesel and automation rates set forth in Section VIII 1. Second and Third paragraph of the Standard Agreement shall not be applicable to the Tankers.

4. The vacation schedule under Section XXVIII shall be amended to cover all licensed Deck Officers accruing 13 days vacation for each 30 days employment.

5. Transportation benefits under Section II 5 and Section XX will be economy class.

6. . . .

MARINE TRANSPORT MANAGEMENT, INC.
BY: —————————————————

INTERNATIONAL ORGANIZATION OF MASTERS, MATES & PILOTS, AFLCIO
BY: —————————————————

The court notes that the draft says May 8, while the actual date of expiration of the Navy Contract is May 7. *See* Dx 14. The difference is *de minimis.*

H. Events in 1984

In a letter dated March 12, 1984, Murphy wrote Lowen to inform MMP that MTL intended to offer the Navy a proposal in response to the Navy's solicitation for bids on a new contract. *See* Px 49 Ex. O at 1. The letter outlined the labor costs that MTL planned to include. *See id.* at 1–2. These costs differed from those contained in the Master Agreement. The letter ended with MTL's hope that MTL's offer would "be favorably received" by MMP and, subsequently, the Navy. *See id.* at 2.

On March 19, 1984, Murphy sent Lowen a second letter regarding another Navy contract that was "up for grabs." *See* Murphy Dep.Ex. H. The letter warned ominously that "[t]here is every indication that companies with labor organizations different from" MTL's unions would "be going after this business." *Id.* The letter included an attachment that compared MTL's "current payroll cost," Schedule A, and the figures the Employer felt it would have to bid at to win the contract. There is a difference per ship per month of $15,-591.18. *See id.*

On March 30, 1984, Murphy sent Lowen another letter. *See* Px 49 Ex. P. This letter referred to the contracts referenced in the March 12 and March 19 letters, and a third contract as well. *See id.* The March 30 letter stated that it was "a follow-up" to a telephone conversation between Murphy and Lowen that had occurred on March 29. *See id.* The letter stated:

> Military Sealift Command continues to insist that we must have written confirmation from our unions indicating approval of our offer. Enclosed is a letter that MM & P gave us last year when we were going after the C–3 vessels. I believe a similar letter having to do with the above RFP's would be acceptable to Military Sealift Command. Obviously, it will be disheartening if the Navy considered our Company non responsive [sic] simply because we did not have a letter.

Px 49 Ex. P.

On April 2, 1984, Captain Lowen provided the letter Murphy requested, for all three contracts. *See id.* Ex. Q.

On April 8, 1984, MMP gave notice to all employers who had agreed to the Master Agreement of its intention to modify and amend the Master Agreement, set to expire at midnight June 15, 1984. *See* Px 17. The notice was sent to "Marine Transport Lines—USN." *See id.;* Tr. 455. Marine Transport Lines—USN apparently is a subsidiary of MTL that manages the operation of the Sealift vessels, though this is unclear. *See* Tr. 463 (quoting Px 49 (Lowen Affidavit) at para. 40). It is located at the same address as MTL. *See* Px 17.

Murphy wrote Lowen again on May 10, 1984. *See* Px 49 Ex. R. Murphy's May 10 letter stated that the Navy required something more specific than Lowen's April 2 letters. Murphy included a draft that MTL believed would satisfy the Navy. *See id.* The letter further stated that MTL had to have the letter, "or something similar," by May 15th. *See id.* Capt. Lowen provided a letter that met MTL's requirements on May 15th. *See* Px 49 Ex. S. In fact, Murphy testified that he could not recall, either way, whether MMP ever refused, during 1984, to give MTL any letter it needed to bid on a Navy contract. *See* Murphy Dep. 79.

On June 6, 1984, Murphy wrote Eugene O'Connor, Vice President & Executive Secretary of Tanker Service Committee, Inc., the bargaining agent for all employers who were parties to the Master Agreement. *See* Dx 48. MTL informed O'Connor that MTL was withdrawing the Tanker Service Committee's authority to negotiate on MTL's behalf towards any new or modified or extended Master Agreement, or to negotiate with any labor organization other than the National Maritime Union. *See id.*

On June 13, 1984, Lowen wrote Marine Transport Lines—USN notifying it, first, that the Master Agreement was being automatically renewed for one year, until June 16, 1985, and, second, that the Sealift Agreement ran until May 7, 1985. *See* Px 19. Lowen believed that, in the absence of a similar letter of renewal, directed to Marine Transport Lines, Inc., MTL had the right to serve a notice of termination of the Master Agreement as it applied to MTL's

commercial fleet. *See* Tr. 501 & Px 20. However, Lowen believed MTL had no right to terminate the Sealift Agreement on June 16, 1984. *See* Tr. 501. The purpose of Px 19, Lowen testified, was to extend the Sealift Agreement from May 7, 1985 to June 16, 1985, so that it would expire simultaneously with the Master Agreement, as renewed. *See* Tr. 502.

On June 15, 1984, MTL sent a telex, under Rand's name, to "all ships in the MTL fleet (Officers and Unlicensed Personnel)." *See* Dx 45. The telex announced that MTL had entered new collective bargaining agreements with three of its unions, and that MTL "ha[d] not renewed [its] contractual relationship with the International Organization of Masters, Mates and Pilots and that contract w[ould] expire on midnight, Eastern Standard Time, on June 15, 1984." *Id.* at 1. The telex stated that "[t]he decision to change MTL's labor affiliation as regards deck officers was not made without careful thought." *Id.* "MTL's unions, *except for MM & P,* have been eager to meet the challenge [of a "depress[ed]" market for MTL's services]. *Only the MM & P has been recalcitrant."* *Id.* at 2. (emphases added).

The telex invited certain MMP members, *see id.* at 3; Tr. at 771–72, to stay with MTL. *See* Dx 45 at 2. MTL offered to pay any fines MMP imposed on those choosing to remain with MTL so long as they took "reasonable steps to avoid or minimize the possibility of a fine by resigning from MM & P." *Id.* at 2. MTL, having learned from the foreign articles episode with MSC, *see* discussion *supra* Part F, also assured crew members that those on foreign articles would not have their terms of employment altered "for the duration of those articles." *Id.* at 3. The telex concluded with new work rules, or working conditions, for licensed deck officers, applicable on June 16, 1984. *See id.* at 3–7. MTL filed this action on June 16, 1984.

MMP members serving on the Sealift vessels were advised by the Union to continue working. MTL, however, stopped recognizing the Union, and refused to make payments towards various Union benefit plans. On October 3, 1984, Capt. Lowen sent a telex to "all MTL vessels" advising Union members to "cease all work of any kind except for that involving security of [the] vessel," but to also remain on board the ships to protect their jobs. *See* Dx 46.

## LEGAL ANALYSIS

It is important to recognize that this action involves three separate, yet intertwined, contracts—the Master Agreement, the Sealift Agreement, and the Navy Contract. MTL acknowledges that the Sealift Agreement exists, but insists that it must be limited to its specific terms. MTL cites the legal proposition that "a reference by the contracting parties to an extraneous writing *for a particular purpose* makes it a part of their agreement only for the purpose specified." *Guerini Stone Co. v. P.J. Carlin Constr. Co.,* 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916) (emphasis added), *quoted in Lodges 743 & 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.,* 534 F.2d 422, 441 (2d Cir. 1975), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976); *see United States v. Foster Wheeler Corp.,* 639 F.Supp. 1266, 1270 (S.D.N.Y.1986); *Rhode Island Hosp. Trust Nat'l Bank v. Ohio Casualty Ins. Co.,* 613 F.Supp. 1197, 1202 (D.R.I.1985), *rev'd on other grounds,* 789 F.2d 74 (1st Cir.1986).

This legal proposition is not, however, applicable to this action. It applies only where there exists two contracts which have distinct, though related, subject matters. *See, e.g., Guerini Stone Co.,* 240 U.S. at 265–66, 36 S.Ct. at 301–02 (subcontract and main contract); *Lodges 743 & 1746, Int'l Ass'n of Machinists,* 534 F.2d at 429 (collective bargaining agreement and "Strike Settlement Agreement"); *Foster Wheeler Corp.,* 639 F.Supp. at 1267 (Letters of Commitment and Letters of Credit); *Rhode Island Hosp. Trust Nat'l Bank,* 613 F.Supp. at 1199–1202 (guaranty bond and distributor contract).

The Sealift Agreement, on the other

hand, is indisputably a modification[12] of the Master Agreement. *See, e.g.,* Dx 42 (June 6, 1983 draft, *supra* note 11) ("WHEREAS, ... the Navy Contract would not have been extended *if the terms and conditions of the [Master] Agreement were applicable to the Navy Contract for the term of this Agreement* ...; and WHEREAS, in light of the foregoing circumstances the parties wish to effect certain changes in the wages, hours, and working conditions [detailed in the Master Agreement]"); Dx 6 at 1 (Rand November 22 letter) ("we have amended our union contracts"); *id.* at 2 ("Formal amendments to the union contracts are expected in due course."); Dx 39 (Lowen November 29 letter (composed by MTL, *see* discussion *supra* at 21–22)) (Subject: "Sealift Operating Contract ... Amendments to Union Contracts"); *id.* ("We have reviewed your letter of November 22, 1982 to Commander, Military Sealift Command, which letter summarized the negotiated amendments to the agreements [sic]. In our opinion you have correctly summarized those amendments."); Tr. 560 (testimony of Murphy, who negotiated the terms for MTL).

■ The modification is an oral one, as the parties never reduced the agreement to writing. *See* discussion *supra* Background Part G. A different rule of law than that cited by MTL applies to such a contract modification, which the court will explicate following a brief discussion of the appropriate standard of proof.

The parties disagree as to the standard, or burden, of proof that must be satisfied to show the terms of an oral modification[13] of a written contract. MTL argues that such terms must be proven by "clear and convincing" evidence. *See, e.g., Amerdyne*

*Indus. v. Pom, Inc.,* 760 F.2d 875, 877 (8th Cir.1985) (applying Arkansas law); *Standard Alliance Indus. v. Black Clawson Co.,* 587 F.2d 813, 829 (6th Cir.1978) (applying Ohio law), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979); *In re Indus. Car Mfg. Co.,* 1 B.R. 339, 343 (Bankr.E.D.Pa.1979) (applying Pennsylvania law); *Thaler v. I C I United States, Inc.,* 476 F.Supp. 67, 71 (W.D.Ky.1979) (applying Kentucky law). MMP asserts that it need prove such terms by the usual civil evidentiary standard of the preponderance of the evidence. *See Barrett v. Bank of Am., N.T. & S.A.,* 183 Cal.App.3d 1362, 1371, 229 Cal.Rptr. 16, 22 (4th Dist.Ct.App. 1986); *Sullivan v. Mosner,* 266 Md. 479, 490–92, 295 A.2d 482, 489 (1972). *See generally Addington v. Texas,* 441 U.S. 418, 423–24, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (explaining that generally standard of proof in civil cases is mere preponderance of evidence, but that "clear, unequivocal and convincing" standard is sometimes applied "to protect particularly important individual interests in various civil cases").

The court need not decide the question. The existence of all *six* modifying terms in the Sealift Agreement are indeed proven by clear and convincing evidence. Those terms are: reduction of all wage rates, including penalty rates, premium rates, and the Master's Financial Responsibility Rate, to June 16, 1981 levels;[14] reduction of vacation benefits to 13 days for each 30 days of employment; elimination of the diesel and automation rates; transportation by economy class; a duration for the Sealift Agreement until May 7, 1985, *see, e.g.,* Dx 42, and the right of MMP to make "changes in the various benefits." *See, e.g.,* Dx 6 at 2. The content of the first five of these modifications is also proven

---

12. Although the parties use the term "amend" or one of its variants almost exclusively, "amend" is synonymous with "modify." *See Webster's Third New International Dictionary* 68 (1986) (definition of amend); *Black's Law Dictionary* 74 (5th ed. 1979) (definition of amendment).

13. The parties do not dispute that "a written collective bargaining agreement can be orally modified." *Certified Corp. v. Hawaii Teamsters & Allied Workers, Local 996,* 597 F.2d 1269, 1271 (9th Cir.1979).

14. MMP did argue that the wage agreement was much broader, but the documents show clearly that none of the rates of the various MMP benefit plans were reduced by the Sealift Agreement. *See* Dx 2 (Schedule A–2); Px 36 Chart 3 ("Comparison of Actual Benefit Fund Contributions to What Contributions Would Have Been if June 16, 1981 Rates Had Been Restored as of January 1, 1983 and Held Fixed").

by clear and convincing proof. The parties disagree as to the content of the sixth. MTL argues that MMP could change only the four substantive "benefits" modified by the Sealift Agreement, while MMP argues that "benefits" refers to everything in Schedule A. It is not necessary to resolve this disagreement, given the ultimate reasoning of the court's analysis.

MTL would have the court require MMP to show by clear and convincing proof that the terms of the Master Agreement *not* modified by the Sealift Agreement are incorporated into the Sealift Agreement. This misconstrues the applicable law. The applicable legal principle is so basic that it is nearly intuitive, and is stated infrequently. As the court stated succinctly in *Robinson v. Crosson*, 149 Colo. 235, 368 P.2d 791 (1962):

> Modifications do not necessarily abrogate the original contract entirely; indeed, the terms of the old contract are still to be followed so far as not changed or as inconsistent with the new terms, and the governing contract may be said to be composed of the new terms and the unchanged terms of the old. An intention to discharge the old contract is not presumed, and it must be made to appear that the parties intended to terminate the old contract in its entirety in order for it to be superceded completely by the new one.

149 Colo. at 238, 368 P.2d at 792–93, *quoted in Fellers–Schoonmaker Homes, Inc. v. Five Star Homes & Real Estate, Inc.*, 158 Colo. 163, 172, 405 P.2d 677, 682 (1965); *accord, Teal v. Bilby*, 123 U.S. 572, 578, 8 S.Ct. 239, 242, 31 L.Ed. 263 (1887) ("It is hardly pretended by counsel ... that it was not competent, after the written contract was made and signed by the parties, for them to make another verbal contract in regard to some parts of it, *which to that extent should be a substitute for the first one.*") (emphasis added); *Corr v. Hoffman*, 256 N.Y. 254, 258, 176 N.E. 383, 385 (1931) (where partnership continued after partnership for term ended, "the copartnership was terminable at will but, so long as it continued, the mutual rights and obligations of the partners remained as defined in the written contract, except in so far as particular provisions of the written articles might thereafter be modified by agreement or might be intended to apply only during the original fixed term") (dictum).

MTL cites *District 2, Marine Engineers Beneficial Association v. Falcon Carriers, Inc.*, 374 F.Supp. 1342 (S.D.N.Y.1974), for the proposition that "[a]n oral agreement entered into during the period of a written collective bargaining agreement ... may be incorporated into the written agreement only when it is not inconsistent with the provisions of the writing." *Id.* at 1348 n. 2. MTL argues that the expiration date of the Sealift Agreement, May 7, 1985, cannot be applied to extend the terms of the Master Agreement not modified by the Sealift Agreement, which terms had an expiration date of June 16, 1984, because it is inconsistent with the termination date of the Master Agreement. The court declines to apply the stated principle to these facts.

First, neither *Falcon Carriers, Inc.* nor the authority it relies on, the Labor Relations Expediter, addresses the meaning of the term "inconsistent." Under MTL's interpretation, no subject covered by a written agreement could be modified orally, except if the oral terms embody a mirror image of the written terms, since any material variance can be denominated an inconsistency. Instead, MTL argues the written agreement could only be supplemented by the addition of completely new terms. Such a proposition is rejected implicitly by numerous cases recognizing that "a written collective bargaining agreement can be orally modified." *Certified Corp. v. Hawaii Teamsters & Allied Workers, Local 996*, 597 F.2d 1269, 1271 (9th Cir.1979) (citing cases). Particularly relevant to this case, in *Certified Corporation* the Ninth Circuit held that a "written collective bargaining agreement ... was orally modifiable as to duration." *Id.; see Trans, Inc. v. Gimbel Bros.*, No. 86–2247, slip op. (E.D.Pa. Feb. 25, 1988) [available on WESTLAW, 1988 WL 17009] (LEXIS, Genfed library, Courts file) (oral modification of duration term could be proven). The court notes that no reported case has followed

*Falcon Carriers, Inc.* on this particular point.

Second, MTL's assertion of this proposition is wholly inconsistent with the central thrust of its case. To apply the proposition in a consistent manner, the court would have to hold that every term of the Sealift Agreement, including the agreement by MMP to accept lower wages, was and is unenforceable.

Third, the policy presumably undergirding the proposition stated in *Falcon Carriers, Inc.*, suspicion of untrustworthy oral agreements, and concern over the absence of sufficient expression of the parties' intent to alter the writing, is not at risk in this action. There is no dispute that the Sealift Agreement expired simultaneously with the Navy Contract's third extension. This has been proven by clear and convincing evidence. *See Trans, Inc., supra* (oral modification of contract's duration term not proven by "clear, precise and convincing" evidence). Thus, the duration of the Master Agreement was extended in relation to the Sealift vessels, while the terms of the Master Agreement not modified were made applicable to those ships until the new termination date of May 7, 1985.

There is an alternative way to view the Sealift Agreement, which reaches the same result. The Sealift Agreement may be seen as a new collective bargaining agreement applicable to the Sealift tankers. "[A] collective bargaining agreement need not be in writing in order to be enforceable." *Certified Corp.*, 597 F.2d at 1272; *see H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 523–26, 61 S.Ct. 320, 324–26, 85 L.Ed. 309 (1941); *Kaylor v. Crown Zellerbach, Inc.*, 643 F.2d 1362, 1367 (9th Cir.1981); *Rabouin v. NLRB*, 195 F.2d 906, 910 (2d Cir.1952); 29 U.S.C. § 158(d) (1982). Where two collective bargaining agreements are executed by the same parties and cover the same subject matter, the latter supercedes the former only as to inconsistent provisions in the two. *See NLRB v. International Union of Operating Eng'rs*, 323 F.2d 545, 546, 548 (9th Cir.1963) ("The provisions of the[ ] two contracts are inconsistent with each other and

since the contracts were entered into by the same parties and cover the same subject matter, it is a well settled principle of law that the later contract supercedes the former contract *as to inconsistent provisions.*") (emphasis added); *Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am.*, 405 F.Supp. 370, 375 (M.D.Pa.1975) ("When two parties ... make a new agreement that is inconsistent with terms of a previous one dealing with the same subject matter, the later agreement operates to rescind and to discharge by substitution the inconsistent parts of the earlier contract."), *aff'd in relevant part*, 544 F.2d 1207 (3d Cir.1976); *cf. Jersey Cent. Power & Light Co. v. Local Unions 327, 749, 1289, 1298, 1303, 1309 & 1314 of I.B.E.W.*, 508 F.2d 687, 702–033 & n. 44 (3d Cir.1975) (dictum) (speaking of conciliation agreement and collective bargaining agreement: "If the new agreement contains terms that are *clearly inconsistent* with the previously existing contract ..., the fact of inconsistency is itself a sufficient indication of intention to abrogate the old and substitute the new.... It [the new agreement] *operates as a discharge by substitution only so far as the inconsistency extends.*") (emphases in original) (bracketed material in original) (ellipses in original) (quoting 6A Corbin, *Contracts* § 1296 (1962)), *vacated*, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976).

■ But regardless of how the Sealift Agreement is viewed, the burden to show intent to supercede the provisions of the Master Agreement not addressed specifically in the Sealift Agreement rests with the party arguing for that result, MTL. The court presumes that on the issue of the applicable standard of proof on this point, the parties would switch arguments, the Union arguing for application of the "clear and convincing" standard, and the Employer arguing for application of the "preponderance of the evidence" standard. Again, it is not necessary for the court to decide the question. MTL has failed to show by even a preponderance of the evidence an intent in the fall of 1982, when the Sealift Agreement was agreed to, to reject the provisions of the Master Agreement that

were not modified. Both Rand and Murphy, the only MTL officials who dealt with Lowen, testified that during the 1982 negotiations they did not discuss with Lowen any aspects of the Master Agreement except those they needed to modify to secure the extension of the Navy Contract. *See* Tr. 625–27 (Murphy); *id.* at 678 (same witness, discussing San Francisco meeting specifically); *id.* at 681 (same witness); *id.* at 976 (Rand, discussing early November meeting). As a matter of undisputed fact, the parties abided by all terms of the Master Agreement, with the Sealift Agreement's specific modifications, from January 1, 1983 to June 15, 1984.

MTL presents five arguments for its theory of the case that the Sealift Agreement superceded in toto the Master Agreement, and was a free standing, complete and fully viable understanding, with only those elements of the Master Agreement necessary to carry out the Sealift Agreement incorporated into it.

MTL first argues that Lowen's April 8, 1984 to "Marine Transport Lines—USN" notifying MTL of the Union's desire to "modify and amend" the Master Agreement "which expires at midnight, June 15, 1984," *see* Px 17, demonstrates that the full Master Agreement was not intended to be incorporated into the Sealift Agreement. The difficulty with this interpretation is clear, since the Sealift Agreement expired on May 7, 1985, and it is questionable whether the notice was sent other than mistakenly. In this connection, Lowen testified that a secretary routinely sent out notices to every company with which MMP had a contract. *See* Tr. 455–64. "Marine Transport U.S.N." was listed as one of the participating employers in the Master Agreement. *See* Dx 43. The court accepts Lowen's testimony that this notice was sent mistakenly by MMP.

Furthermore, MTL would have been entitled to reject Lowen's letter and refuse to negotiate on new terms of the Master Agreement, as those terms applied to the Sealift Agreement, since modification of any contract can occur only on the mutual agreement of the contracting parties to new terms.[15] *See Nyhus v. Travel Management Corp.,* 466 F.2d 440, 445 (D.C.Cir.1972) ("The power to contract is also the power to modify the effect of prior agreements by mutual consent."). Witness the Sealift Agreement itself. Where there is no agreement to modify, the original terms remain in force. The Sealift Agreement ran from January 1, 1983 to May 7, 1985. Had MTL and MMP negotiated a new Master Agreement in 1984, MTL could have refused to apply those new terms to the Sealift tankers.

Finally, even if Lowen possessed this subjective view of the Sealift Agreement, he failed to express it in 1982, at the time the parties agreed to the modification. Because any such intent was not expressed, it is irrelevant.

A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent.

*Hotchkiss v. National City Bank,* 200 F. 287, 293 (S.D.N.Y.1911) (L. Hand, J.), *aff'd,* 201 F. 664 (2d Cir.1912), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913), *cited in City of Yonkers v. Otis Elevator Co.,* 649 F.Supp. 716, 733 n. 21 (S.D.N.Y.1986), *aff'd,*

---

**15.** Anthony Naccarato, who negotiated modifications to the Master Agreement with MMP, on behalf of employers other than MTL, in the summer of 1982, understood this principle. *See* Naccarato Dep. 39–40 (stating that neither MMP nor the employers agreeing to modifications could change the terms of the modified agreement "without mutual agreement").

844 F.2d 42 (2d Cir.1988); *see also Republic Aviation Corp. v. Republic Lodge No. 1987, Int'l Ass'n of Machinists*, 10 Misc.2d 783, 793, 169 N.Y.S.2d 651, 664 (Sup.Ct. 1957) ("Disclosed intent, not some undisclosed subjective intent or understanding, controls contractual relationships.").

Various MTL witnesses testified that they also understood at the time the modification was agreed to that the Master Agreement's unmodified terms being applied to the Sealift vessels up until June 15, 1984 would not extend beyond that date. However, they never expressed this belief in 1982, not even to one another. *See* Tr. 627 (Murphy testimony) (Murphy never expressed this intention to Lowen); *id.* at 1000–01 (Rand testimony) (Rand never expressed this intention to Lowen); *id.* at 999–1000 (Rand testimony) (Rand never expressed this intention to Murphy). Moreover, the court finds that MTL officials were simply not credible on this point, just as they were not credible on other critical points relevant to this litigation. The court also notes that the evidence is clear that MTL did not approach the 1982 negotiations with MMP or the Navy coolly, cautiously, and systematically, but rather acted hastily, and with great informality. MTL may even have made a false statement to the Navy. *See* discussion *supra* at 5–6 & note 5. Indeed, MTL realized after the Navy Contract extension had been agreed to that it had made an error that would cost the company over one-half million dollars, but for the Navy's sympathetic benefaction. *See* discussion *supra* Background Part F. Lastly, this court cannot allow MTL to pick and choose when it will accept Lowen's unexpressed intentions, and when it will not.

MTL presents a sub-argument that Lowen's attempt to automatically renew the Sealift Agreement by his June 13, 1984 letter, *see* Px 19, demonstrates that everything except the specifically negotiated terms of the Sealift Agreement expired on June 16, 1984. This letter is a dubious predicate for such a claim, since it was a legal nullity. Because section I(1) of the Master Agreement was incorporated fully into the Sealift Agreement, MTL had until sixty days prior to May 7, 1985 to serve a notice of intent to renegotiate, amend, or terminate the Sealift Agreement. When the June 13, 1984 letter was written, MTL's time to indicate such intent had not in fact expired.

The same principle defeating MTL's first argument, that modification requires mutual consent, serves to refute its second argument. MTL points to the prior history of MMP–MTL collective bargaining and the Navy Contract, and argues that after the parties modified the manning provision contained in the 1972–'75 Master Agreement, allowing MTL to secure the original Navy Contract, *see* discussion *supra* Background Part A, the parties still negotiated entirely new Master Agreements in 1975, 1978, and 1981. All this evidence demonstrates is that a modified contract may be modified a second time. Indeed, this past history actually demonstrates the principle applicable here. When new Master Agreements were entered, they incorporated the unmodified term of the manning provision of the Navy Contract.

MTL's third argument relies on a comparison between the oral modification entered between itself and MMP and written modifications MMP entered in 1982 with other employers. In those written modifications, MMP and the employers expressly agreed that "[a]ll provisions of the [Master] Agreement not specifically modified or waived herein shall continue in force and effect." Px 72 at § III(6); Px 73 at § III(6); Px 74 at § III(6). MMP had the same intent in entering all of the modifications, oral or written—to preserve jobs for its members.

MTL argues that the inclusion of the clauses continuing the unmodified provisions of the Master Agreement in the written modifications shows that Lowen did not intend the unmodified provisions to continue as part of the Sealift Agreement. All that these clauses demonstrate is that those employers acted more cautiously than MTL did. (After all, they did secure *written* agreements.) The applicable controlling legal principle, that unmodified provisions are incorporated into the modified

agreement, creates terms that are implied in law. These other agreements merely made such an obligation express. The clauses are, in ultimate effect, as unnecessary as an explicit term that states that the parties agree to carry out their obligations in good faith and deal fairly with each other.[16] MTL cannot show by the absence of an explicit term in the Sealift Agreement continuing the Master Agreement's unmodified provisions that there was an expressed intent between MTL and MMP to supercede the Master Agreement in its entirety. In this regard, it is immaterial whether Lowen entered those other contracts prior to entering the Sealift Agreement. His "unexpressed thinking," *see* Tr. 492 (remarks of MTL counsel), is irrelevant to discovering the objective agreement these parties reached. *See* discussion *supra* at 44–45.

MTL's fourth argument relies on a line of cases that stand for the proposition that parties may contract to provide that certain obligations continue beyond the termination of the contract itself. *See, e.g., Weimer v. Kurz–Kasch, Inc.*, 773 F.2d 669, 676 (6th Cir.1985); *Bower v. Bunker Hill Co.*, 725 F.2d 1221, 1222 (9th Cir.1984); *International Union, UAW v. Yard–Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). Thus, according to MTL, MTL and MMP agreed that the particular terms of the Sealift Agreement would survive beyond expiration of the Master Agreement, while its other terms would not.

These cases are inapposite. In each instance, they concern agreements to pay certain benefits accrued by employees during the period of the collective bargaining agreement at a time subsequent to the expiration of the collective bargaining agreement. *See Weimer*, 773 F.2d at 676 (retiree insurance benefits); *Bower*, 725 F.2d at 1222 (retiree medical insurance); *Yard–Man, Inc.*, 716 F.2d at 1479 (retiree insurance benefits); *see also John Wiley & Sons v. Livingston*, 376 U.S. 543, 552–55,

84 S.Ct. 909, 916–17, 11 L.Ed.2d 898 (1964) (severance pay, vacation pay, and pension plan contributions). On the other hand, the Sealift Agreement is intended to establish the "wages, hours and working conditions which shall be applicable to the licensed Deck Officers employed aboard the [Sealift] Tankers," *see* Dx 42, *supra* note 11, for the duration of the contract period established by the Sealift Agreement. The Sealift Agreement does not defer or extend payment of particular benefits.

MTL's fifth and last argument, to which the parties devoted a substantial amount of court time, derives from the fact that after the Sealift Agreement was reached, on January 1, 1983 and again on January 1, 1984, pursuant to the Master Agreement, MMP notified MTL that the rate of contribution for the MMP Health and Benefit Plan must be raised, and MMP demanded and received higher compensation. MTL offered this evidence to rebut the Union's claim that MTL had agreed, during the course of the negotiations in 1982, to "lock in" all items listed on Schedule A. The Union by that claim hoped to buttress its argument that the entire Master Agreement was incorporated into the Sealift Agreement.

The court agrees with MTL that MMP agreed only to commit to wage reductions. *See* discussion *supra* at 15–16 & note 14. Accordingly, this line of contention and proof is irrelevant to the outcome of the action. As the Sealift Agreement necessarily incorporated all provisions of the Master Agreement which were not inconsistent with its modified terms, it was entirely appropriate that MMP demand that MTL pay the increases in this rate that occurred as dictated by the Master Agreement. The provision in the Master Agreement covering the health and benefit rate continued to be applicable to the Sealift vessels because the parties did not modify it.

■ In conclusion, it appears unequivocally that the parties did abide by the Mas-

---

**16.** "[I]n every contract there exists an implied covenant of good faith and fair dealing." J. Calamari & J. Perillo, *Law of Contracts*

§ 11–38(b) at 509 (3d ed. 1987) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933)).

ter Agreement, as modified by the particular wage and benefit items of the Sealift Agreement, except for its term of duration, for the period January 1, 1983 to June 15, 1984. The court concludes that the parties intended that the Sealift Agreement extend the entire Master Agreement (as modified by the Sealift Agreement) with respect to the Sealift vessels until May 7, 1985. In accordance with the court's Order filed December 22, 1986, all remaining issues are committed to arbitration.

Although the general issue of escalation and MTL's specific right to collect payment from the Navy for the 1983 and 1984 increases in MMP's health and benefit rates [17] has been found to be immaterial to the resolution of this lawsuit, discussion of the issue at some length is warranted, because the court's broader credibility determinations are based in some measure upon the testimony offered on this issue.

The original Navy Contract contains an article entitled "Escalation." *See* Dx 15 Art. 31. That section required the Contractor, MTL, to submit a Schedule A showing labor costs on March 1, 1974. *See id.* Art. 31(a). Escalation would occur under the following circumstances:

> In the event that after 1 March 1974 the Contractor, as a result of collective bargaining agreements, or as a result of a change in the composition of the tankers' crews or the special maintenance riding crews, shall be required to pay *total wages* to the special maintenance riding crews or to the complement of the tankers in excess or less than those shown in Schedule A, for the period commencing upon the effective date, payment will be made by the Government or credits by the Contractor for adjustments upward or downward during that period, not less frequently than every three months.

*Id.* Art. 31(d) (emphasis added); *see* discussion *supra* at 14–15 (definition of "total wages"). As stated by P. Allen Benson, MTL's manager of fleet accounting, *see*

Benson Dep. 5, "the difference in [the base Schedule A and the current Schedule A] was the amount of money billed under escalation." *Id.* at 11; *accord,* Tr. 922 (Brunkhorst testimony); *see, e.g.,* Dx 18. Article 6(k) of the Navy Contract states that "[a]ll renewals or *modifications* of labor agreements negotiated by the Contractor covering the operation of the tankers under this Contract *shall be submitted for approval by the Government before the same shall be binding on the Government.*" Dx 15 Art. 6(k) (emphases added).

Karen Brunkhorst, MTL's assistant manager of vessel accounting, Tr. 915, testified that until March 1983, MTL submitted a revised Schedule A to the Navy "whenever the crew complement changed, whenever the base rate changed, and generally if there was a large change in any of the calculations we made to a benefit plan or if something other major changed." Tr. 924; *see id.* at 963 (Rand testimony) (Navy Contract "requir[ed]" MTL to provide MSC with revised Schedule A "each time there was a material change in" MTL's costs, especially those resulting from new contracts with MTL's labor unions, which "required approval by the Navy"). Brunkhorst, however, also testified that MTL was required to submit a revised Schedule A in situations "when the *base wages* changed," *see* Tr. 924 (emphasis added), not, as stated in Art. 31(d), when "total wages" changed. *See* Dx 15 Art. 31(d) (quoted in discussion *supra* at 51).

It is uncontroverted that from March 1, 1983 to May 7, 1985, MTL did not submit any revised Schedules A to the Navy. *See* Tr. 922 (Brunkhorst); *id.* at 938–39 (same witness); Benson Dep. 39. The reason for this is the commitment MTL gave to the Navy in the 1982 negotiations between MTL and the Navy. The November 12 letter, referring to two alternative Schedules A being submitted with that letter, states that "[b]oth *sets of figures are firm*

---

17. The National Maritime Union's health and benefit rate increased as well. *See* Tr. 930; Px 36. Also, MTL actually paid approximately twenty-six thousand dollars more in 1983 and 1984 (until June 15) to the health and benefit

plans of its other two unions with members working on the Sealift vessels than it would have if the health and benefit rates of those other two unions had been held "firm." *See* Px 36.

for the option period 1983–1985." Dx 2 at 1 (emphasis added). On November 15, MTL's Capt. Downing sent a telex to MSC stating that "Schedule A, delivered with our letter [dated] 12 November 1982, *is firm* through May 1985." Dx 5 (emphasis added). On November 22, MTL sent MSC a letter notifying the Navy, pursuant to Article 6(k) of the Navy Contract, that "[a]ll of the unions have agreed to *hold total compensation levels firm* through May 7, 1985." Dx 6 at 2. As a result of MTL's commitment, the Navy was able to compute to "a fair degree of certainty" the Contract Price of extending the Navy Contract with MTL until May 7, 1985. *See* Dx 14 para. 3(a).[18] The Navy then calculated a per diem cost for the entire two year period of the extension. The per diem cost included the base Contract Price, *"Escalation of Total Wages,* Subsistence and Stores," and Crew Overtime. *See id.* para. 7 & NOTE (emphasis added). The Navy knew, because Schedule A would be held "firm," the absolute cost of escalation over the two years.

When the Navy confirmed the extension of the Navy Contract, it sent MTL a letter of "essential points of understanding and agreement." *See* Dx 8. This letter specifically stated: "It is understood this Revised Schedule A *will remain firm* from 1 January 1983 through May 1985." *See id.* at 2 (emphasis added). Rand testified that MTL committed itself not to submit any more Schedules A for the period January 1, 1983 until May 7, 1985. *See* Tr. 992.[19]

On July 5, 1983, Rand, on behalf of MTL, executed Amendment No. 19 to the Navy Contract. *See* Dx 15 Bates stamp ## 100478–100481. Amendment No. 19 contained the modifications agreed to in the 1982 negotiations between MTL and the Navy. Paragraph 4 stated various changes to Article 31(b) of the Navy Contract, which defines the terms "total wages," "stores," and "subsistence." *See* Dx 15

Art. 31(b). Paragraph 4(c) of Amendment No. 19 stated: "Effective 1 March 1983, the Revised Schedule A per diem rate for each tanker is $5,008.63 for the period 1 March 1983 through 6 May 1985." *See id.* Bates stamp #100480. The figure $5,008.63, which cannot increase, is derived by taking the yearly total for all the figures on Schedule A–2 submitted with the November 12, 1982 letter, $1,828,151.24, *see* Dx 2, and dividing that total by 365 to arrive at a daily figure. *See* Dx 29 ("Wages Escalation Based on Revised Schedule 'A' Effective March 1, 1983"). Thus, from March 1, 1983 through May 6, 1985, MTL could recoup, under the escalation provision of the Navy Contract, the difference between the revised Schedule A ($5,008.63) and the base Schedule A ($2,857.84). *See* Dx 29. This figure is $2,150.79 per ship per day. *See id.*

The health and benefit rate for all MTL's unions was a constituent element of Schedule A. *See* Tr. 904 (testimony of Biago Perillo, MTL payroll department manager—*see* Tr. 891). The health and benefit rate was also part of what the Navy considered "total wages." *See* discussion *supra* at 6–7 (definition of "total wages"). The figure of $5,008.63 includes a calculation for MTL's daily contribution to MMP's Health and Benefit Plan.

On January 1, 1983, there was an increase in the MMP health and benefit rate, dictated by the Master Agreement, and on January 1, 1984, another increase occurred. Counsel for MTL called these rises, collectively, "dramatic[ ]." *See* Tr. 1227. These increases are reflected in certain charts MTL prepared for trial. Between January 1, 1983 and June 15, 1984, MTL contributed $541,058.70 above what it would have if the health and benefit rate of its four unions had remained at the rate that MTL had included with the Schedule A that was

---

**18.** The Contract Price could not be computed with complete accuracy because the Navy did not possess the necessary January 1983 figures in November 1982. *See* Dx 14 para. 3(a).

**19.** Because of the problem with foreign articles, *see* discussion *supra* Background Part F, the Navy allowed an amendment of the extension "changing the date of implementation of reduced wages from January 1, 1983 to the termination of existing foreign articles." Dx 13.

"firm." *See* Px 36 chart 4.[20] The figure for MMP alone was $194,350.15 above what otherwise would have been paid by MTL.

It is now necessary to turn to the billing practices of MTL relating to the Navy Contract. Beginning with the original Navy Contract, MTL billed the Navy for four categories of costs. First, MTL billed a "bimonthly contract price invoice." *See* Tr. 918. This contained the Contract Price (the basis for escalation) paid by the government, and certain overtime calculations. *See id.; see also* Benson Dep. 9. Second, MTL recouped its further actual labor costs by submitting a "wage escalation invoice." *See* Tr. 918–19; Benson Dep. 17–21. Third, MTL billed for escalation in subsistence and stores. *See* Tr. 918; *id.* at 919. Finally, MTL billed for "assorted kinds of pass-through billings." Tr. 918. This included, *inter alia,* "overtime for items that were entirely within the[ ] [Navy's] control." *Id.* at 921.

The wage escalation invoice was a monthly invoice. *See id.;* Benson Dep. 11. With this invoice, MTL recouped the increase in the actual labor costs above the 1974 Schedule A (the difference between the current Schedule A and the base Schedule A). *See* Tr. 923. "Labor costs" includes all the figures on Schedule A, including pension, and health and benefit. *See, e.g.,* Dx 18; Dx 19; Dx 20; Dx 21.

MTL pointed out that the Navy did in fact reimburse MTL for the increased payments MTL made as a result of the rises in MMP's (and the National Maritime Union's) health and benefit rates, as well as increased payments made to the other unions' health and benefit plans, *see* discussion *supra* note 17, occurring *after* the Navy exercised the option to extend the Navy Contract. *See, e.g.,* Px 37; Px 38; Px 39; Px 40. Nevertheless, the circumstances of that reimbursement are peculiar. Furthermore, there was inconsistent and evasive testimony presented by MTL on the subject.

There are two unusual circumstances associated with the reimbursement by the Navy of the increased health and benefits payments MTL was making. First, MTL waited a full year before submitting the first invoice seeking reimbursement. Second, MTL created an entirely new invoice to recoup these sums.

MTL did not include the increases in health and benefit payments over the rates contained in Schedule A–2 on the wage escalation invoices being submitted monthly to the Navy, *see* Tr. 923; *id.* at 939, despite the fact that the wage escalation invoices included a bill for the health and benefit payments as they appeared in Schedule A–2. *See* Dx 2 & Dx 29. Instead, MTL submitted these increases through separate "wage escalation (adjustments)" invoices. *See, e.g.,* Tr. 923; Px 37; Px 38; Px 39. The form MTL used was "very similar to the wage escalation invoice and it was adapted for this kind of billing." Tr. 943. Brunkhorst testified that it would not be possible to include these increases in the health and benefit rates on the monthly wage escalation invoices MTL was sending the Navy

> [b]ecause that is not the way the wage escalation invoice is to be calculated. That is a specific invoice that is in the billing examples that goes with the contract and the form must be followed. We cannot just change the form to fit our needs.

Tr. 942–43. The court fails to see how a change in figures would alter the "form" of the wage escalation invoice. However, such a change would, it seems, change some of the dollar figures on the invoice. Because the per diem escalation figure of $2,150.79 could not increase between March 1, 1983 and May 6, 1985, *see* discussion *supra* at 54–55; Dx 29, the monthly wage escalation invoice could only reflect certain figures—the number of ships multiplied by the number of days in service. It appears from MTL's "wage escalation (adjustments)" invoices that it was MTL's practice

---

**20.** Chart 4 speaks of Schedule A–1. This refers to Schedule A–1 submitted with Rand's November 12, 1982 letter, Dx 2 or Px 29. *See* Tr. 903. This does not alter the calculations of additional health and benefit plan payments, because there is no difference in the Schedule A–1 and Schedule A–2 figures for this labor cost. *See* Dx 2; discussion *infra* in the text at 27–28.

to calculate a monthly debit total, and then calculate separately any credits for items such as vacation or days when any of the ships were being overhauled. *See* Px 37. If that was MTL's practice with respect to the wage escalation invoices, then the wage escalation invoice would have to reflect, somewhere, one of three figures after March 1, 1983: $541,999.08 ($2,150.79 × 9 (ships) × 28 (days in February)); $580,-713.30 ($2,150.79 × 9 × 30); or $600,070.41 ($2,150.79 × 9 × 31). Inclusion of the changes in MTL's payments to the health and benefit plans would produce different numbers.

Curiously, MTL did not bill the Navy in February, 1983 for the increased cost it had incurred in the health and benefit payments in January, 1983. In fact, it was not until February 10, 1984 that MTL sent MSC one of these "wage escalation (adjustments)" invoices. *See* Px 37. The February 10 invoice covered the entire year of 1983. *See* Tr. 940; Px 37. Brunkhorst had no valid explanation for this twelve-month delay in billing:

Q. It was not in the company's interest to wait a whole year before billing for monies that it actually sent out, isn't that right?

A. It depends if something else was going on at the time, something maybe of greater monetary importance.

Q. Is it your understanding that this delay with respect to the submission of [the February 10 invoice] was because of something else that was going on at that time?

A. It's very possible.

Q. Do you have some knowledge of that or are you just speculating?

A. Items that were billed to the government were billed, of course, on a dollar amount priority, but they were also done based on what was currently going on. We did a lot of catch-up billing during that time. We had extreme concentration on billing the Navy for past overtime pass-through billings. We did go through—well, cadets became billable at that time and we had to retroactive [sic] bill back through I

believe 1979 to invoice the Navy for those. So that might have taken priority over something else.

. . . .

Q. But is it true that after this first one was sent they were sent on a quarterly basis, is that right?

A. That is true.

Q. Was there a difference in priorities that explains why they were sent on a quarterly basis?

A. It's possible.

Q. Are you aware of any?

A. Things change in any department.

Tr. 942, 944. Rand attributed the delay to somewhat different reasons.

Q. Do you know why it took 14 [sic] months for MTL to send the bills to the Navy?

. . . .

A. I believe that at that time we were either just in the process or had just— we were in the process of preparing for or had just completed a physical move of the company or a physical change in our computer hardware. I know there were 2 instances in this general time frame where we had a lot of accounting problems, particularly in our billing section, and some bills just did not go out.

Q. And that accounts for the 14–month [sic] lapse in sending the increased costs over to the Navy?

A. I believe that's correct. That is my recollection.

Tr. 1102. Brunkhorst also stated that "the necessary back-up documentation" to complete the wage escalation (adjustment) invoice varied from that used to calculate the wage escalation invoices that MTL was sending out monthly. *See* Tr. 943. However, looking at Px 37, it is obvious that this "back-up documentation" provided figures that were used in basic mathematical calculations. *See id.* There is no indication in the record that MMP withheld from MTL the per diem rates MTL would need to make these calculations for any period of time. Rather, as the questioning at trial indi-

cated, MMP demanded payment immediately. *See* discussion *supra* at 58–59.

Brunkhorst also testified that MTL was *not required* to submit a revised Schedule A if there was a "large change in any of the contributions [MTL] made to a benefit plan," but did so anyway, as if doing so was merely a courtesy to the Navy. Tr. 924. This testimony is not consistent with the Navy Contract, which requires the Contractor to submit "[a]ll modifications of labor agreements." *See* Dx 15 Art. 6(k). Further, it is inconsistent with the fact that the benefit plan figures were part of Schedule A–2, the daily figure of which could not increase after March 1, 1983. Any increase in the contributions to any plan would change these figures. The court also notes that on July 1, 1981, MTL submitted a revised Schedule A that differed from the Schedule A submitted just two weeks earlier, on June 16, 1981, only in the figures for "Pension & Welfare" and "Feinberg Award." *Compare* Dx 18 (June 16, 1981 Wages Escalation Based on Revised Schedule A) *with* Dx 19 (July 1, 1981 Wages Escalation Based on Revised Schedule A).

Although Brunkhorst stated that she was "responsible for all payables, all receivables, [and] all cash receipts" for MTL, and that the people who prepare the bills submitted to MSC for the Sealift tankers worked "directly for" her, *see* Tr. 916, she took pains to point out that she did not prepare the wage escalation (adjustment) invoices. *See* Tr. 938 ("It was not my job, it was someone who worked for me. They did it, yes."); *id.* at 941 (Brunkhorst had no part in cutting the February 10 invoice, "other than to know of its existence and make sure the secretary typed it and it went out on a timely basis"). She never inquired prior to February, 1984, why MTL was not billing the Navy for these costs. *See* Tr. 940. Nobody told her that such a bill should be prepared. *See* Tr. 941. *But see* Tr. 945 ("Q. You were simply told that such a payment had been made and that the Navy should be invoiced for it[?] A. Yes."). Her boss, Benson, instructed a contract specialist to bill the item, and Brunkhorst did not ask why this had not happened sooner. *See* Tr. 941. She could

not state when Benson gave this instruction. Tr. 945.

Benson, the manager of fleet accounting, gave some equally puzzling and evasive answers in his deposition. Referring to these increases in the health and benefit rates, MMP's counsel asked Benson:

Q. Do you know the magnitude of the welfare increases?

A. No.

Q. How were you aware that there were increases?

A. I just know.

Q. Did somebody tell you that?

A. I billed the Navy for increases. I just know. I don't know where they came from.

Benson Dep. 41–42. Even with the benefit only of the cold written transcript, it is apparent that Benson was very anxious about this subject:

Q. ... You said that no one in your office calculated what the increases were, and I am trying to find out how the increases got transmitted to the Navy in the form of a bill from MTL?

A. My department made no calculations. We obtained letters from the union stating the rates. These rates were passed on to the Navy in additional bills.

Q. Well, let's—

A. Am I—

Q. Let's assume—let's not assume anything.

[MTL counsel]: Do you want to talk to me about something?

THE WITNESS: Not really, no.

. . . .

Q. You also said that there were some increases in payroll taxes between the period March 1 of '83 and May 7 of '85. Who was responsible for calculating those payroll tax increases?

A. See, I don't understand your indication. We don't calculate increases, benefits or payroll taxes. I don't know who does that calculation, either the union or the government.

Q. All right. Let me try it another way.

THE WITNESS: I think we should talk a second.

A. [MTL counsel]: Why don't we just take a break. Off the record.

Benson Dep. 43–44. After conferring with counsel, Benson amended his answer to indicate that "[m]y department would take the information obtained from the appropriate [rate], calculate the difference in the rates, the increase up or down, and cut an increase [sic] to the Navy for that difference." Benson Dep. 44.

Benson claimed that he telephoned the Navy to discuss how to pass on to the Navy the welfare cost increases, *see id.* at 46–47, and was prompted to call the Navy because he "realized that there were increases of various fringe benefit rates," *id.* at 48, even though no person at MTL ever told him that the Schedule A effective March 1, 1983 could not be amended or changed. *See id.* at 54–55. Benson could not remember who he spoke with at the Navy, *see id.* at 47, nor when he spoke with the person. *See id.* Benson could not even recall "what time of year" he made the call. *See id.* He evaded answering counsel's question seeking the name of the person at the Navy Benson asked to speak to, *see id.,* and he did not receive any explanation as to why it would not be necessary to submit a revised Schedule A. *See id.* at 48. It is also curious that Benson would assume this responsibility, because he testified to the following:

Q. Who in your office would be responsible for preparing those revisions and sending them to the Navy? When I say revisions, I mean to Schedule A.

A. My billing specialist.

Q. *Is there anybody above a billing specialist who would determine when a revised Schedule A had to be submitted to the Navy?*

A. *No.*

Benson Dep. 46 (emphasis added). Benson claimed that he called the Navy because it was "a pain" to revise Schedule A, and that he did not believe it was necessary. *See id.* at 48.

Benson claimed he was under the same impression as Brunkhorst as far as when it was necessary to submit a revised Schedule A:

Q. ... [D]id anyone at the Navy tell you under which—under what circumstances revised Schedule As did have to be submitted?

A. I don't know.

Q. Did you have any understanding of your own with respect to when revised Schedule As had to be submitted?

A. Yes.

Q. What was that understanding?

A. That the only time a revised Schedule A had to be submitted was when the complement of the crew was changed, or the wages were changed.

Q. What do you mean by wages.

A. What the man gets in his pocket.

Q. *Base wages?*

A. *Yes.*

Q. Suppose there were an increase in the pension rate or the vacation rate; was it your understanding that a revised Schedule A would not have to be submitted?

A. It was.

Q. What was that understanding based on?

A. I don't know.

Benson Dep. 50 (emphasis added). Benson's understanding conflicts with the requirement of Article 6(k) in the Navy Contract that all modifications of labor agreements that would change Schedule A be submitted to the Navy for approval.

Another witness for MTL, Michael Berkowitz, gave plainly incredible testimony on the subject of escalation. In his deposition, Berkowitz was asked about the November 12 letter, which he authored. Specifically, Berkowitz was asked what he meant when he stated that "[b]oth *sets of figures* are firm for the option period 1983–1985, and we have our unions' agreement for the *lower wages* during the period." *See* Dx 2 (emphases added). Berkowitz replied:

What we were saying at that time, was that MTL was prepared to commit to the

figures that were attached which means that we would hold firm *and not hold the Military Sealift Command responsible for increases, such increases as might occur with respect to the—whatever figures were on [Schedule A]. The distinction being an agreement between us and the Military Sealift Command and what may be different agreements with respect to labor unions, whatever.*

Berkowitz Dep. 14–15 (emphasis added). At trial, Berkowitz recanted this testimony, claiming that

> what we intended to say, or what I intended to say because I wrote it, was that the wages, the bulk of what the Navy had been concerned about over the period was *base wages and vacation* and that when the figures are going to be firm we felt that what they were focused on was the wage items because that is the bulk of what happens.
>
> Most of the other things they weren't concerned about.... *[A]ll we felt that we had to say was holding firm was on the wage items*, and when I say that we have our union's agreement for the lower wages, what I am saying is MTL is being responsible.

Tr. 1122 (emphases added). It is astonishing, and simply not convincing, that a graduate of Harvard Law School, *see* Tr. 1111–12, and a Fulbright Scholar, *see id.* at 1111, would be so inarticulate in the preparation of the text of a crucial letter that he would use the words "sets of figures" to mean "wage items" in the same sentence that he actually used the word "wages." Berkowitz claimed that the November 12 letter was drafted "in some haste," but that it needed no clarification because he "think[s] the[ ] [Navy] fairly well understood" that he meant "wage items" when he said "sets of figures." *See* Tr. 1135.

Berkowitz insisted that pension and welfare rates could rise and be reimbursable from the Navy under the Navy Contract during the period of the 1983–'85 extension even though Schedule A was "firm." Tr. 1123. MTL, he said, had no intention of capping the pension and welfare costs reflected on Schedule A. *See id.* at 1134–35. Under Berkowitz's interpretation, MTL could have submitted revised Schedules A

for the increases in health and benefit rates that actually occurred in 1983 and 1984, in a manner similar to its submission on July 1, 1981, *see* discussion *supra* at 60–61, rather than creating the "wage escalation (adjustments)" invoice. Berkowitz's belief that the Navy "fairly well understood" that these items could increase is not consistent with Amendment No. 19 to the Navy Contract. *See* discussion *supra* at 22–23.

The purported explanation for Berkowitz's recantation of his deposition testimony is that at the time of his deposition when he was shown the Schedules A that were attached to the November 12 letter, Berkowitz had "in ... mind" the handwritten Schedule A attached to MTL's October 26 letter. He claims that his comments regarding what would be "firm" relate only to the handwritten Schedule A. Tr. 1125–26. MTL's counsel "pointed out that he thought I made a mistake and we interrupted the deposition while he took me out in the hall and showed me the 2 letters and I realized I made an error and we went back in and explained to" MMP's counsel. Tr. 1128. Berkowitz's characterization of this incident is misleading. Berkowitz did not explain to MMP's counsel that only the wage items on Schedule A would be held "firm" after he consulted with his lawyer.

> Q. [L]et me show you what has been marked as Exhibit D, a letter dated October 26, 1982 and it has an attachment in handwriting.
>
> A. Yes.
>
> Q. Is that the attachment you were testifying about earlier where you did it in pen?
>
> A. Yes, it is.
>
> Q. Is it now your recollection that that document was attached not to the November 12 letter of Mr. Downing but to an October 26th letter[?]
>
> [MTL Counsel]: Off the record.
>
> ....
>
> A. Yes, that is my recollection.
>
> Q. So that it may well be then that what we previously marked as Exhibit C [Schedules A–1 and A–2 attached to the November 12 letter] was attached to the November 12 letter, is that correct?

A. It may be, yes.

Q. You have no recollection that that is what was attached?

A. No.

Berkowitz Dep. 27–28.

The explanation itself is simply unfathomable. The only different figures in the handwritten Schedule A, as compared to Schedules A–1 *and* A–2 of the November 12 letter, are for overtime. This is due to the fact the October 26 Schedule A is based on an overtime percentage of 80, *see* Dx 1, while in Schedule A–1 the overtime percentage is 85, and in Schedule A–2 it is 78. *See* Dx 2. Other than overtime, every figure—basic monthly wage, pension rate, welfare amount, vacation rate and amount, Feinberg award amount, and payroll taxes (except for one figure missing from the handwritten Schedule A)—is exactly the same on all three Schedules A. The court rejects Berkowitz's explanation.

Like Berkowitz, Rand testified that he was an unskilled communicator to the Navy. In his November 15 telex, he said that *"our unions have agreed that the prices* reflected in our letter [dated] 12 Nov 82 ... shall be effective as from 01 Jan 1983."* Dx 3 (emphasis added). At the trial, Rand insisted that "prices" did not mean every component of schedule A, but only the wage terms negotiated with the unions. *See* Tr. 1081–83. Like Berkowitz, Rand "believe[s] that the[ ] [Navy] understood" what Rand meant by this term. *See* Tr. 1084. According to Rand, pension and welfare contributions, although a component part of Schedule A, were not included as a "price" reflected in the November 12 letter. *See* Tr. 1083. Neither Rand nor Berkowitz offered any document that stated to the Navy that it was the intention of MTL that only the wage terms included on Schedule A would be held "firm."

Rand also gave contradictory testimony on what was meant when the Navy, in its December 9 letter, Dx 8, said "Revised Schedule A will remain firm from 1 January 1983 through May 1985." *Compare* Tr. 986 ("We would not give the[ ] [Navy] a new Schedule A in substitution or replacement of the one that had been attached to our [November 12] letter and that the numbers on the paper would not change.") *with id.* at 1091 (stating belief that the Navy was prepared to accept increases in costs in all areas beyond the items fixed in the 1982 negotiations between the MMP and MTL). At other points, Rand testified that by "firm" in his November 12 letter he meant that "Schedule A–1 itself, as a basis, as an example for escalation, ... would not be changed." Tr. 1062. However, "the only items [on Schedule A] that [he] had in mind, that would be fixed to the Navy, for the period of the renewal, were base wage, ... and vacation plus diesel and automation allowances which are going to be eliminated." Tr. 1060. Again, the position that only wage items on Schedule A–2 could not increase is not consistent with Amendment No. 19 to the Navy Contract. *See* discussion *supra* at 54–55.

This review does not exhaust the contradictory, evasive, and incredible testimony presented in this case by present and former officials of MTL. It is sufficient, however, to demonstrate why the court finds the testimony offered by these witnesses upon the whole case not worthy of credit. Their self-serving interpretation of the Navy Contract, and their actions regarding it, though not here directly germane because of the legal analysis undergirding the decision and judgment, are, at the least, troublesome. The court notes that while the fact the Navy paid the increases in health and benefit rates MTL belatedly passed along is irrefutable, and these costs exceeded $500,000 up until June 15, 1984, no witness explained the Navy's position as to why it paid these invoices.

## CONCLUSION

This matter is referred to arbitration pursuant to paragraph two of the Order filed December 22, 1986. Plaintiff's complaint for declaratory judgment is dismissed with prejudice insofar as it relates to defendant's second counterclaim. Defendant shall submit a final judgment on notice of five days to plaintiff. "Leave is granted to reopen the action should it be necessary to do so to further implement the court's judgment or to enforce any arbitration award. It is intended, however, [that] the judgment to be entered will be final."

*Royal Air Maroc v. Servair, Inc.,* 603 F.Supp. 836, 842 (S.D.N.Y.1985).

SO ORDERED.